

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CR-14-459

| | |
|---|---|
| | **OPINION DELIVERED** DECEMBER 17, 2014 |
| JALIBRA INGRAM<br>APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FIRST DIVISION<br>[NO. CR-2012-534] |
| V. | |
| STATE OF ARKANSAS | HONORABLE JAMES LEON JOHNSON, JUDGE |
| APPELLEE | AFFIRMED |

**ROBERT J. GLADWIN, Chief Judge**

Jalibra Ingram was convicted in the Pulaski County Circuit Court on February 18, 2014, of filing a false report with a law-enforcement agency, a violation of Arkansas Code Annotated section 5-54-122 (Supp. 2013). She was sentenced to three years' probation and was ordered to pay $1470 in court costs and restitution to the City of Little Rock in the amount of $4048.06. On appeal, she argues that substantial evidence did not support that she gave a false statement or that the Little Rock Police Department expended more than $500 investigating her alleged false report. We affirm.

Appellant was charged by amended felony information with filing a false report with a law-enforcement agency. On January 3, 2012, appellant called 911 and asked for an officer to come to her address. She stated that Ron Mitchell took her keys, that he had been violent toward her, and that he had a pistol and kept "pulling it out" on her and threatening her with

it. When asked if she had been hit, she responded affirmatively, and stated that she just wanted to leave. Later, appellant called 911 again and stated that she wanted to cancel the call because Mitchell had given her keys back. She then stated, "Y'all might need to get here quick cause I'm 'bout to kill somebody."

Little Rock Police Officer John Mack testified at appellant's trial that he was called to appellant's house pursuant to the 911 call. He was informed that appellant had reported that she was being held against her will by a man with a gun. He testified that the information he received was that the man had pointed the gun at appellant several times. While he was en route, he was notified that appellant had called back and said that her call could be disregarded. Due to the nature of the call, Officer Mack went to the address. When he arrived, no one answered the door. He heard something moving around inside the house, like furniture being moved, so he had the police communications call appellant back and ask that someone come to the front door where he could see their hands. He said that a black female, later identified as appellant, came to the door and looked at him, he gave her several verbal commands to come outside, and then he heard a man's voice. He could not tell what the man said, but appellant shut the door and locked it. Officer Mack then notified his supervisor and made several attempts for police communications to call back for someone to come out, but no one did. Officer Mack's supervisor then notified the SWAT team to come. Officer Mack set up a perimeter, and the SWAT team responded. After several hours of negotiation, appellant did come out. However, tear gas had to be used to force Mitchell out of the house. Both were taken to the detective division for questioning.

2

The jury was presented with an interview of appellant by Detective Krystal Haskins at the detective division. Appellant was asked why she called the police, and she stated, "Uh, for my keys." She explained that Mitchell had taken her keys around 2:00 or 3:00 a.m. She described Mitchell and stated that they had been roommates since September 2011. She said that she called the police because she had to "tussle" with Mitchell to try to get her keys because she wanted to leave. When asked if Mitchell ever struck her, she said, "No, not really. He pulled my arms up behind my head like that and put me in a lock you know." She said that once she got free, she called the police because she was "real pissed off." During her conversation with the 911 operator, she was asked if Mitchell had a gun, and she said that she had responded that he did. Haskins asked appellant whether Mitchell had the gun out, and the following was stated:

APPELLANT: Nnn–it was out, but I really wasn't paying that much attention to it cause I was frightened like that—

HASKINS: Okay.

APPELLANT: You know what I'm saying? I just know I was like forget that and ran back to my room cause I was on the phone with the Officer and he was steady yapping.

HASKINS: Okay, so when you say he had it out, just tell me how he had it out.

APPELLANT: It was just laying there you know.

. . .

HASKINS: Did he ever point it at you at any point?

APPELLANT: Huh uh.

HASKINS: Did he ever threaten to use it or–

3

SLIP OPINION

APPELLANT: Nawww.

HASKINS: Okay, uh so you ran and you phoned the police and they asked you did he have a weapon–

APPELLANT: Uh huh.

HASKINS: and you told them that he did?

APPELLANT: Yeah.

. . .

HASKINS: Okay, so then you get the keys and you call and say hey you know what—

APPELLANT: Yes, I wanna cancel.

HASKINS: Don't worry 'bout it.

APPELLANT: Yes.

. . .

HASKINS: Okay, so what happened then?

APPELLANT: Uh, I know he was on the phone with the uh sheriff or the chief and I—I was listening to them and I laid down and I was like well maybe they'll end up talking it out. End up—he end up giving my keys back, but I thought they was gonna leave. I end up dozing back off.

. . .

HASKINS: Were you ever scared of Ron to the point that you felt like you couldn't leave the house?

APPELLANT: No.

HASKINS: No? You could—you could've walked out at any point?

APPELLANT: Yeah, it was just (*inaudible*).

HASKINS: That was before the police got there?

APPELLANT: Yeah, it was just I was pissed off cause he wouldn't give me my keys to the car.

HASKINS: Okay.

APPELLANT: And that's the only thing I wanted to get resolved, him to give me my keys. That's the only reason why I called the police to try to scare him to give me my keys back you know.

HASKINS: Okay.

APPELLANT: But he still didn't give 'em to me. So I was like what—so I don't know.

. . .

APPELLANT: Not really. I just didn't know it was gonna go this far or have all them Officers out there you know.

Lieutenant Tim Calhoun, a member of the SWAT unit, testified that it is protocol when someone cancels a 911 call to make contact with the complainant to ensure that person was not under duress to call back and advise that everything was fine. He also testified that the personnel cost directly related to this call was $3788.06 and that the chemical munitions that were deployed cost $260, for a total of $4048.06. He said that it took four hours from the time SWAT arrived for the event to end.

Appellant moved for a directed verdict at the close of the State's evidence, arguing that the elements of the charge were not met because she did not report anything other than a Class D felony (Mitchell pulling a gun on her), when the statute requires that she falsely report a Class Y, A, or B felony. Further, appellant claimed that she never said she was not free to leave or that she was being held against her will. Appellant also argued that any money spent on the police labor and munitions was not part of investigating the false police report.

5

The State responded that the investigation of the entire report is the entire incident. The State claimed that the incident reported was that Mitchell held a gun to appellant and would not allow her to leave, which is kidnapping, a Class B felony.

Appellant added to her motion for directed verdict the argument that the State did not prove that the report was actually false. The State responded that appellant said it was false during the interview with police. The circuit court denied the motion.

Appellant testified that she called the police because Mitchell took her keys from her because he did not want her to leave. They were "tussling," and she called police. She said she told police that he was threatening her with a gun by making gestures. She said, "It was like he was going to pull it out." She said that she did not give the police a false report. She said that she still lives with Mitchell.

Appellant renewed her motion for directed verdict based on her argument that the State failed to show that the report was false and that the money that was spent was to investigate a false report. The State added to its earlier response that appellant stated that she was about to kill someone to the 911 operator, which is a Class Y felony. The motion for directed verdict was denied.

The circuit court found that a false report was made and found appellant guilty under Arkansas Code Annotated section 5-54-122(b), which provides that "[a] person commits the offense of filing a false report if he or she files a report with any law enforcement agency or prosecuting attorney's office of any alleged wrongdoing on the part of another person

6



knowing that the report is false." Appellant was later sentenced to probation and restitution as set forth above. This appeal timely followed.

In reviewing a challenge to the sufficiency of the evidence to support a criminal conviction, we view the evidence in the light most favorable to the State, considering only the evidence that tends to support the verdict. *Satterfield v. State*, 2014 Ark. App. 633, ___ S.W.3d ___. We will affirm if the finding of guilt is supported by substantial evidence, direct or circumstantial. *Id.* Substantial evidence is that which is of sufficient force to compel a conclusion one way or the other beyond suspicion or conjecture. *Id.* The weight of the evidence and credibility of the witnesses are matters for the fact-finder, not for the trial court on a directed-verdict motion or this court on appeal. *Id.* The fact-finder is free to believe all or part of a witness's testimony and may resolve all questions of conflicting testimony and inconsistent evidence. *Id.*

## I. *False Statement*

Appellant first argues that the circuit court erred in denying her motion for directed verdict because the State failed to introduce substantial evidence that she made a false report to a law enforcement agency when she called 911. Appellant contends that she told the operator that Mitchell would not give her keys to her and that he was threatening her with a pistol. She told the operator, "I just want to leave." Appellant claims that the State's case was that these statements were false because they were contrary to statements she made later in the day to Detective Haskins. She argues that proof of the inconsistency between two

statements given by one person is insufficient, standing alone, to prove which of the statements was false.

Appellant cites *Thomas v. State*, 51 Ark. 138, 10 S.W.193 (1888), for the proposition that the inconsistency of two statements given by one person, without additional proof of which statement was false, is insufficient to prove which statement was false. She argues that common law requires that a statement was not proven to be false solely because it was inconsistent with another statement given by the same person. She claims that the State's proof of the falsity of her statements to the 911 operator was the inconsistency of the statements when compared to statements she made to Detective Haskins. Appellant contends that as a matter of the common-law "two statements" rule, the State's proof was insufficient.

However, we note that appellant did not make the inconsistent-statements-rule argument before the circuit court. Her argument was that the two statements did not conflict and that the State did not prove that appellant's statement was false. At no time did appellant contend that the State's proof was lacking due to there only being proof of inconsistent statements made by appellant. On appeal, an appellant is limited to the scope and nature of the arguments he or she made below that were considered by the trial court in rendering its ruling. *Nalls v. State*, 2014 Ark. 434, ___ S.W.3d ___. Accordingly, we affirm on this issue.

## II. *Proof of Class D Felony*

Arkansas Code Annotated section 5-54-122(c)(1)(A)–(E) provides that filing a false report is a Class A misdemeanor unless:

(A) The alleged criminal wrongdoing is a capital offense, Class Y felony, Class A felony, or Class B felony;

SLIP OPINION



(B) The law enforcement agency or prosecuting attorney's office to whom the false report is made has expended in excess of five hundred dollars ($500) in order to investigate the false report, including the costs of labor;

(C) Physical injury results to any person as a result of the false report;

(D) The false report is made in an effort by the person filing the false report to conceal his or her own criminal activity; or

(E) The false report results in another person being arrested.

Appellant argues that the circuit court erred in denying her motion for directed verdict because the State failed to produce substantial evidence that the Little Rock Police Department expended more than $500 to investigate the alleged false report. She contends that to investigate is to "make an inquiry," citing *Black's Law Dictionary*. She argues that the State did not introduce substantial evidence that the SWAT team officers made any inquiry into the falsity of her report to 911. She maintains that surrounding a building or house is not an inquiry. She admits that her interview with Detective Haskins was an investigation, but she contends that the interview did not cost the police department in excess of $500.

The State argues that appellant incorrectly interprets the statute to suggest that the investigation into the crime of false reporting must cost more than $500, when the investigation is as to the crime alleged in the report that was later found to be false. We agree. We construe criminal statutes strictly, resolving any doubts in favor of the defendant. *Malvin v. State*, 2014 Ark. App. 584, ___ S.W.3d ___. We also adhere to the basic rule of statutory construction, which is to give effect to the intent of the legislature. *Id.* We construe the statute just as it reads, giving the words their ordinary and usually accepted meaning in common language, and if the language of the statute is plain and unambiguous, and conveys a clear and

definite meaning, there is no occasion to resort to rules of statutory interpretation. *Id*. Additionally, in construing any statute, we place it beside other statutes relevant to the subject matter in question and ascribe meaning and effect to be derived from the whole. *Id*. In *Sluder v. Steak & Ale of Little Rock, Inc.*, 361 Ark. 267, 206 S.W.3d 213 (2005), our supreme court stated that it refused to engage in statutory interpretations that defy common sense and produce absurd results.

Accordingly, appellant's false report resulted in the evidence presented of the man hours and cost to the Little Rock Police Department. This evidence was sufficient to prove an expenditure in excess of $500. Therefore, substantial evidence supports her conviction of a Class D felony. We do not address appellant's argument regarding Class Y, A, or B felonies because the expenditure in excess of $500 satisfies section 5-54-122(c)(1) in elevating filing a false report to a Class D felony.

Affirmed.

WHITEAKER and HIXSON, JJ., agree.

*Sandra S. Cordi*, Deputy Public Defender, by: *Clint Miller*, Deputy Public Defender, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Kathryn Henry*, Ass't Att'y Gen., for appellee.