

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CR–15–670

| | |
|---|---|
| CHARLES RONK<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br><br>APPELLEE | **Opinion Delivered:** February 24, 2016<br><br>APPEAL FROM THE COLUMBIA COUNTY CIRCUIT COURT [NO.CR-2014-56-5]<br><br>HONORABLE DAVID W. TALLEY, JR., JUDGE<br><br>AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant appeals from his conviction in circuit court of kidnapping.[1] On appeal, appellant's sole argument is that the circuit court erred in denying his motion for directed verdict on his kidnapping charge. We affirm.

Appellant was arrested on February 28, 2014, and charged by information with kidnapping on March 12, 2014.[2] A trial on the matter was held on April 10, 2015. The testimony was as follows.

---

[1] Appellant was also convicted of false imprisonment in the first degree, domestic battery in the second degree, two counts of aggravated assault on a family member, two counts of terroristic threatening in the first degree, a terroristic act, and two counts of endangering the welfare of a minor in the first degree. He does not appeal these convictions.

[2] An amended information was later filed reducing the number of kidnapping counts from 547 to 1. Other changes are irrelevant to this appeal.

Brittney Morgan, a convenience store employee, testified to seeing a "small elderly lady" come in the store who had been crying, was "shy and nervous," and "seemed terrified and as if she wanted to tell [Morgan] something." The lady told her she had just "escaped" from her son's house; that she was "scared" of him; that she was "trying to get away"; and that her son "abused her, choked her and locked her in a room" that she had been in for "awhile." The more the lady talked, the farther she backed away from the store's door. The lady stated that she wanted Morgan to call the police when asked. She told Morgan that she "didn't want to go back to her son's home" and said she was "terrified" of him. The woman was later identified as appellant's mother, Kazuko Ronk ("Ms. Kay").[3]

Lieutenant Corey Sanders, of the Magnolia Police Department at the time, testified that he responded to Morgan's call to police. He found Ms. Kay in the store appearing as if she were trying to hide. He described her as having a "shaky" voice, "messy" hair, and dirty clothing with a "really strong odor about her body." Ms. Kay told him that she was afraid of her son; "did not want her son to find her"; and wanted to get out of her son's home because he "hits her, had been kicking her and he locked the doors so she could not go outside." When asked if she locked herself in her room or if appellant locked her in her room, she stated that "[appellant] locked [her] in." She told him that her son had choked her on four or five occasions, had "struck her across the top of her back and shoulders with a metal pipe or metal rod," and had threatened her with a gun "many times." She said he used a black gun with a red light that he would shine in her eyes while telling her that he would kill her the "next time." She stated that she believed he was going to kill her. She

---

[3] In all testimony below, Kazuko Ronk is referred to as "Ms. Kay."

identified appellant as her son. Lieutenant Sanders admitted that he knew of no reports of abuse or domestic violence by Ms. Kay to police.

Lieutenant Sanders helped execute a search warrant on appellant's house, at which time appellant was arrested without issue. Lieutenant Sanders described the home as "completely trashed" with "anything you can imagine piled a couple feet high all through the house." He testified that while one can lock most bedroom doors from the inside, the door knob to Ms. Kay's room "had been reversed where you could lock it from the outside." There was evidence that "extra measures had been taken to secure the doors where [Ms. Kay] couldn't open them from the inside, with nail and wood screws." He noted seeing a throw latch on the rear door that appeared to have once been screwed down, but the screws were missing. Ms. Kay told him that she had removed the screws.

Ms. Kay testified that before the last year and a half—"it started getting bad about a year and half" ago—she could move around the house, smoke on the porch and go for walks. She testified that she eventually could not walk anywhere because of the "lock on the door; [appellant] lock [sic] the door every time" and there was "no exit." She did not state exactly when these limitations were imposed. She also testified that "there came a time when [she] couldn't get out of [her] room" for what she believed was two weeks' time though she was "not exactly sure."

She testified that appellant put a pillow over her face once so that she could not breathe. She stated that appellant had kicked her; choked her; threatened her with a gun, fired shots in her room four times; and hit her with a pipe. She stated that she was "always scared of [appellant]," but she never left because she "never [thought she] could get out."

Regarding the day she ran away, she said she turned up the sound on the television to make appellant believe she was watching it while she ran away. She said she was hiding behind a counter in the store because she was "so scared he [sic] come in, follow [her]."

Jessica Ronk, appellant's wife, testified that the lock on the door on Ms. Kay's room was "on backwards to where the lock was on the living room side of the door" and that the door was "always" locked. She denied believing Ms. Kay was in danger. She agreed that Ms. Kay "liked to walk," was "pretty free to do what she wanted to do" and "always came back" at an earlier time, but stated that Ms. Kay's going out of her room "became less and less" with her not being allowed to go anywhere and her walks stopping "within a year" of their arrest.[4]

Jessica denied seeing appellant physically abuse Ms. Kay, asserting that she was not allowed in the room during their arguments, but she testified to hearing Ms. Kay "calling, falling, crying" and hearing things "being knocked off." She heard appellant tell Ms. Kay that he would kill her "many times" and that he "wished [Ms. Kay] were dead." She stated that appellant "always had a weapon on him," had fired shots from his gun in the home, and that her stepdaughters were present when he did so. She testified that she had previously withheld information because she was "afraid to tell the truth" and "afraid" of appellant. She stated that the last three years had "a lot of drug use"; "a lot of guns"; and "a lot of violence, both physical, verbal, emotional, for all members of the house." She said she was

---

[4] Jessica was also arrested and charged in connection with Ms. Kay's treatment.

fearful of her husband, noting that he had shot a gun at her. However, she denied that appellant ever hit her, admitting that she hit him.

R.R., appellant's 13-year-old daughter, testified that she saw appellant choke Ms. Kay once, saw him pull a gun on Ms. Kay, and had heard him threaten to kill Ms. Kay. She had seen appellant point "more than one gun at people," including Ms. Kay and Jessica.[5] She testified that Ms. Kay seemed scared. She helped her dad put the screws in the door to prevent Ms. Kay's exit. She stated that Ms. Kay was stuck in her room "two or three months before the arrest" and she "never seen [sic] [her] grandmother go outside the door." She did not know why she "couldn't let her out." She testified that she left a screwdriver in Ms. Kay's room.

Detective Colton Burks, then of the Magnolia Police Department, testified he helped execute the search warrant. He recounted what Ms. Kay told him, which corroborated prior testimony. He noted that one door was barricaded. He observed another door with a "hotel lock" that could freely open while in Ms. Kay's room, but he noticed two screw holes where screws had been. Ms. Kay said she used a screwdriver to remove the two screws from the "hotel lock[,]" and he found the screws wrapped in a paper towel on a corner table as Ms. Kay said he would. He verified that the screws found on the table fit the holes. He found what he believed were bullet holes in Ms. Kay's room and in the porch connected to her room.

---

[5] It appears that R.R. refers to Jessica as her "mom."

After Detective Burks's testimony, appellee rested and moved for a directed verdict on the kidnapping charge. The motion was denied.

Following the denial of his motion for directed verdict, appellant testified.  He denied that he kidnapped Ms. Kay, falsely imprisoned her, terrorized her, exposed her to serious physical injury, pointed a gun at her, or threatened her.  Things that he did not flatly deny, he gave an excuse for. He admitted putting locks on her doors, but stated that he did so because "[Ms. Kay] couldn't be trusted to walk outside and be by herself for more than an hour," having to be looked for on two occasions, and because the family was being harassed. He asserted that the locks were for her "own good." He also testified that the reversed doorknobs were that way when he moved in, and he just never switched them around.

He admitted shooting a hole in the bathroom floor, but asserted that it was an accident as he was not intentionally trying to shoot Jessica and that the children were outside playing when it happened. He also admitted shooting a hole in Ms. Kay's room and in the porch just outside her room, but asserted that on the two separate occasions, he was trying to shoot an alligator and a raccoon outside the house. He admitted being "verbally and emotionally abusive at times," but denied being physically abusive, though he admitted shoving Ms. Kay "several times throughout the years." He said he did not cover Ms. Kay's face with a pillow, but threw it at her. Furthermore, he stated that he did not hit Ms. Kay with a pipe; he threw a pipe that "deflected off [a cabinet] and bounced onto her." Despite the locked doors, he asserted that Ms. Kay had access to the basement which had an exit from the house.

Dr. Julia Wood, a forensic psychologist, testified to what appellant told her during an August 5, 2014 evaluation, but she did not give any opinion about his mental capacities. Appellant renewed his motion for directed verdict after Dr. Wood's testimony and it was denied. The jury subsequently found appellant guilty of kidnapping, and the circuit court sentenced him, according to the jury's recommendation, to twenty-five years' imprisonment in the Arkansas Department of Correction. This timely appeal followed

On appeal, appellant argues that the circuit court erred in denying his motion for directed verdict on the kidnapping charge. Appellant's sufficiency argument regarding the kidnapping charge is preserved; however, appellant has changed the scope of his argument on appeal. To the extent that he argues that his mother "willingly lived" with him—that she consented to live with him and therefore could not be kidnapped—we agree with appellee that appellant did not make this argument below. We also agree with appellee that appellant did not make the argument below that the circuit court did not find the three factors necessary to permit kidnapping as a separate offense from an underlying offense.[6] It

---

[6] Appellant concedes in his brief that sufficient evidence existed to convict him of false imprisonment, but cites *Hickey v. State*, 2010 Ark. 109, in support of his argument that sufficient evidence did not exist to support a conviction for a separate offense of kidnapping. He quotes *Hickey* for the statement that "[a]mong the factors that have been considered by courts in determining whether a separate kidnapping conviction is supportable include whether the movement or confinement (1) prevented the victim from summoning assistance; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." The case *Hickey* cites, *Lee v. State*, 326 Ark. 529, 932 S.W.2d 756 (1996), makes it clear that these factors are to be considered in determining the sufficient amount of restraint needed incidental to rape to permit an additional charge of kidnapping. *See Mayes v. State*, 351 Ark. 26, 28, 89 S.W.3d 926, 927 (2002). Appellant concedes that he restrained Ms. Kay, so even if this point were preserved, this case would be irrelevant.

is well settled that a party is bound by the nature and scope of the objections and arguments made at trial and may not enlarge or change those grounds on appeal.[7] Otherwise, we address the sufficiency of the evidence pursuant to appellant's directed verdict motion and affirm.

We treat a motion for directed verdict as a challenge to the sufficiency of the evidence.[8] In reviewing a challenge to the sufficiency of the evidence to support a criminal conviction, we view the evidence in the light most favorable to the State, considering only the evidence that tends to support the verdict.[9] We will affirm if the finding of guilt is supported by substantial evidence, direct or circumstantial.[10] Substantial evidence is that which is of sufficient force to compel a conclusion one way or the other beyond suspicion or conjecture.[11] The weight of the evidence and credibility of the witnesses are matters for the fact-finder, not for the trial court on a directed-verdict motion or this court on appeal.[12]

---

[7] *Stewart v. State*, 2012 Ark. 349, at 8, 423 S.W.3d 69, 74 (citing *Frye v. State*, 2009 Ark. 110, 313 S.W.3d 10).

[8] *Williams v. State*, 2011 Ark. App. 675, at 5–6, 386 S.W.3d 609, 61 (citing *Sparacio v. State*, 2009 Ark. App. 350).

[9] *Ingram v. State*, 2014 Ark. App. 707, at 7, 452 S.W.3d 595, 599 (citing *Satterfield v. State*, 2014 Ark. App. 633, 448 S.W.3d 211).

[10] *Id.*

[11] *Id.*

[12] *Id.*

The fact-finder is free to believe all or part of a witness's testimony and may resolve all questions of conflicting testimony and inconsistent evidence.[13]

A person commits the offense of kidnapping if, without consent, the person restrains another person so as to interfere substantially with the other person's liberty with the purpose of facilitating the commission of any felony or flight after the felony, inflicting physical injury upon the other person, or terrorizing the other person or another person.[14] Appellant argues that while there was evidence that he restrained Ms. Kay, as evidenced by his concession that the charge of false imprisonment was proved,[15] appellee failed to prove that he did so with the purpose of facilitating the commission of any felony or flight after the felony, inflicting physical injury upon the other person, or terrorizing the other person or another person. We disagree.

There was substantial testimony from Ms. Kay regarding appellant's threats to kill her and his physical harm to her. Her testimony was virtually identical to what she told Lieutenant Sanders and Detective Burks. Appellant's wife testified that he was verbally and emotionally abusive; he admitted this. Though he denied any physical abuse, R.R. testified to seeing him physically abuse Ms. Kay. Despite his assertion that he only stated that he

---

[13] *Id.*

[14] Ark. Code Ann. § 5-11-102(a)(3)(4)&(6) (Repl. 2013).

[15] Ark. Code Ann. § 5-11-103(a) (Repl. 2013) states that a person commits the offense of false imprisonment in the first degree if, without consent and without lawful authority, the person knowingly restrains another person so as to interfere substantially with the other person's liberty in a manner that exposes the other person to a substantial risk of serious physical injury.

wished Ms. Kay were dead and did not threaten to kill her, both Jessica and R.R. testified that they heard him threaten Ms. Kay's life. Though appellant denied or explained these witnesses' testimony in all material aspects, the jury is free to disbelieve the appellant's self–serving testimony.[16] The credibility of witnesses is an issue for the jury and not the court.[17] The trier-of-fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence.[18] The evidence, when viewed in the light most favorable to appellee, was sufficient to support appellant's kidnapping conviction. We affirm.

Affirmed.

VAUGHT and HOOFMAN, JJ., agree.

*Louis L. Loyd*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Adam Jackson*, Ass't Att'y Gen., for appellee.

---

[16] *See Halliday v. State*, 2011 Ark. App. 544, at 5, 386 S.W.3d 51, 55; *Goodman v. State*, 2009 Ark. App. 262, 6, 306 S.W.3d 443, 446.

[17] *Williams v. State*, 2011 Ark. App. 675, at 6, 386 S.W.3d 609, 613 (citing *Morgan v. State*, 2009 Ark. 257, 308 S.W.3d 147).

[18] *Id.*