Cite as 2023 Ark. App. 23

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CR-22-103

| | |
|---|---|
| JUSTIN SHIYONE MOODY <br> APPELLANT <br><br> V. <br><br><br> STATE OF ARKANSAS <br> APPELLEE | Opinion Delivered January 25, 2023 <br><br> APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT [NO. 23CR-19-1548] <br><br> HONORABLE TROY B. BRASWELL, JR., JUDGE <br><br> AFFIRMED |

**KENNETH S. HIXSON, Judge**

Appellant Justin Moody was convicted in a jury trial of driving while intoxicated (DWI), first-degree battery, and refusal to submit to a chemical test. The convictions arose from a two-car traffic accident in which a passenger in the other vehicle suffered serious physical injuries. On appeal, Moody challenges the sufficiency of the evidence to support each of his convictions. We affirm.

I. *Standard of Review*

In reviewing a sufficiency challenge, we assess the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Armstrong v. State*, 2020 Ark. 309, 607 S.W.3d 491. We will affirm a judgment of conviction if substantial evidence exists to support it. *Id.* Substantial evidence is evidence that is of sufficient force and

character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Id.* Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Collins v. State*, 2021 Ark. 35, 617 S.W.3d 701. Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.* Further, the credibility of witnesses is an issue for the jury, not the court; the trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Armstrong, supra.*

## II. *Facts*

Shortly after midnight on April 6, 2019, Moody was driving a white van westbound on Interstate 40 between Mayflower and Conway, where the aforementioned traffic accident occurred. Several witnesses testified that Moody was driving erratically and at a high rate of speed.

Natasha McEntire testified that she was driving in the right lane on Interstate 40 near the Mayflower exit when Moody's van came up behind her at a high rate of speed. Natasha stated that she was traveling between seventy-five and eighty miles an hour and that the van "literally at the last moment jerked over to go around" her and was going so fast that it shook her vehicle. McEntire stated that, after Moody passed her, she saw him come up on other vehicles in front of her and do the same thing.

McEntire stated that, a short while later, she came upon an accident scene that involved Moody's van and another car near the Highway 65 exit in Conway. Traffic was

stopped due to the accident. McEntire exited her vehicle and saw a police officer open the passenger-side door of the van so Moody could get out of the van. The officer told Moody to stand by the van, and according to McEntire, Moody appeared "like he was intoxicated, couldn't stand straight, kind of fumbling back with his feet."

Billy Dunham is an EMT who was driving an ambulance westbound approaching Conway that night when he, too, was passed by Moody prior to the accident. Dunham testified that he was in the far left of three lanes—having just passed another vehicle in the center lane—when Moody's van came up behind him at a high rate of speed, swerved over onto the left shoulder of the interstate, and passed him on the shoulder that was between the far left lane and a concrete barrier. Dunham stated that when Moody passed him, the inside lane was clear. Dunham estimated his own speed at between seventy-five and eighty miles an hour and stated that the van was traveling "way faster than 80" and was "in less than a minute . . . out of sight."

Dunham stated that a few minutes after Moody had passed him on the shoulder, he came upon the accident scene. Dunham activated his emergency lights and maneuvered his ambulance so as to block traffic. Dunham went to Moody's van, asked if he was okay, and Moody responded that he was. Dunham stated that Moody did not appear to be injured. He testified that on the basis of his observations and his interaction with Moody, Moody "acted like he was under the influence of something."

Maddylin Dake was the driver of the other vehicle involved in the accident, and Sarah Hitchens was a passenger. Dake testified that she was driving her car about sixty-five miles

3

an hour in the right lane of westbound Interstate 40 near the Highway 65 exit in Conway when Moody's van approached from behind at a high rate of speed and struck the back of her vehicle. The collision propelled Dake's car into a concrete barrier on the right side of the interstate, and the car then spun across the interstate and crashed into a concrete barrier on the left side, coming to a rest. Dake stated that when Moody struck her from behind, there were no cars in the middle or left lanes.

Dake stated that, immediately after the crash, she got out of her car to assess the situation. Moody's van was behind them, at a complete stop, and Moody then attempted to drive away. Dake indicated that she had to take evasive measures to avoid being hit by Moody. She stated, "I wasn't sure . . . if he was going to hit me again while I was walking." Dake stated that Moody's van sped past her, veered left, and collided with a metal barrier, coming to a stop.

Sarah Hitchens, Dake's passenger, corroborated Dake's account of the accident. Hitchens stated that after the accident, Moody got out of his vehicle and "then he got back in his vehicle, backed up, [and] started leaving." Hitchens stated that she then started "screaming at [Dake] because he almost hit [her]." Then, according, to Hitchens, Moody drove into a wall. As a result of the accident, Hitchens's right femur and left ankle were fractured and had to be surgically repaired, which resulted in a protracted impairment.

Arkansas State Trooper Kenya Campbell was dispatched to the scene of the accident. After receiving the call and activating her emergency equipment, her patrol car immediately

4

engaged its dashcam and passenger-compartment video cameras—which also included audio—and these recordings were admitted at trial and played to the jury.

When Officer Campbell arrived, she saw Moody leaning against the passenger side of his van. Officer Campbell asked Moody how he was doing, and he responded, "I'm good." When asked if he needed to be checked out by the paramedics, Moody said that he did not.

Officer Campbell then asked Moody what had happened. Moody responded that he "was trying to get back on 12" and was trying to get to Maumelle.[1] Campbell asked Moody if he had been drinking or had taken anything, and Moody responded that he had not. Officer Campbell twice asked Moody who he wanted to retrieve his vehicle, with no response from Moody. When Officer Campbell asked Moody if he could hear her, he replied, "I can hear you," and stated, "I'm going to run into town now, so—."

Officer Campbell testified that she arrested Moody for DWI on the basis of several different factors. She stated that when she interviewed Moody outside his van, there was a strong odor of intoxicants. Officer Campbell stated further that Moody's arrest was in part based on narratives given to her by other motorists who had witnessed his high-speed erratic driving that had resulted in near crashes in the minutes leading up to the accident. Officer Campbell also noted that Moody was unable to explain what had happened or where he was going.

---

[1]At the time of the accident, Moody was seventeen miles west of Maumelle and headed in the wrong direction.

After Officer Campbell arrested Moody, she handcuffed him, placed him in the back of the patrol car, and drove him to the jail. Officer Campbell stated that during the transport, Moody fell asleep, which she stated is unusual for an arrestee and is additional evidence of intoxication. When Moody awoke in the patrol car, he complained that his handcuffs were too tight, and Officer Campbell told him that she would adjust them when they got to the jail. According to Officer Campbell, Moody then appeared to have trouble breathing, and she became concerned for his safety. When she pulled into the sally port of the jail, medical personnel removed Moody from the car and laid him on the floor to evaluate him. Ultimately, Moody told the medical personnel that he was fine, and the medical personnel suspected that Moody had been hyperventilating from anxiety. After Moody was checked out by the medical personnel, he was taken inside the station. Officer Campbell stated that she went over the consent form with Moody and asked him to take a breath test. According to Officer Campbell, Moody refused to take the test, which she indicated on the form to have occurred at 2:20 a.m.

Moody testified on his own behalf. Moody stated that because his car was broken down, he had borrowed the white van from a friend about a month before the accident. Moody stated that during that month, he had experienced numerous mechanical problems with the van and that he had a new starter installed. Moody stated that the engine sometimes revved when the van was started and that when the van reached a certain speed, the steering wheel would rock back and forth. Moody stated that before he borrowed the van from his friend, he had seen his friend lose control of the van due to a mechanical issue.

Moody testified about the night of the accident. Moody stated that he had been at an after-work potluck dinner in Jacksonville where no alcohol was present. Moody denied having anything to drink that night. He stated that after he left Jacksonville, he was driving to Conway to stay at his cousin's house. Moody stated that while he was driving on Interstate 40, the van surged, the engine revved, and the steering wheel was rocking. Moody described the van as a "runaway vehicle" and stated that he was "navigating in and out of traffic . . . trying to make sure [he didn't] hit anybody." Eventually, however, he collided on the interstate with the car being driven by Maddylin Dake.

Moody stated that Officer Campbell's testimony about a strong odor of alcohol may have been due to the cologne he was wearing. Moody stated further that, although he did not remember hitting his head or being injured in the accident, he became dizzy and "didn't know what was going on" when he was being transported in the patrol car. Moody stated that while they were at the jail, he was "falling over and everything" and asked to speak with a nurse. Moody testified that after that, "[he didn't] really remember exactly what happened." Moody stated that he did not refuse to take a breath test.

At the conclusion of the jury trial, Moody was convicted of DWI, first-degree battery, and refusal to submit to a chemical test. Moody now appeals.

III. *Analysis*

For his three arguments on appeal, Moody challenges the sufficiency of the evidence to support his convictions for DWI, first-degree battery, and failure to submit to a chemical test. We review each sufficiency challenge in turn.

7

## A. DWI

It is unlawful for an intoxicated person to operate or be in actual physical control of a motor vehicle. Ark. Code Ann. § 5-65-103(a)(1) (Repl. 2016). Intoxicated is defined as "influenced or affected by the ingestion of alcohol, a controlled substance, any intoxicant, or any combination of alcohol, a controlled substance, or an intoxicant, to such a degree that the driver's reactions, motor skills, and judgment are substantially altered and the driver, therefore, constitutes a clear and substantial danger of physical injury or death to himself or herself or another person[.]" Ark. Code Ann. § 5-65-102(4) (Supp. 2021).

Moody argues that there was insufficient evidence to support his DWI conviction because there was no substantial evidence of intoxication. Moody submits that he was not drinking that night and that his erratic driving was caused by the van's mechanical malfunctions, causing him to lose control of the van. Moody asserts that after the accident, his speech was not slurred, his eyes were not glassy, and he was seen on the dashcam video ambulating normally to the patrol car upon his arrest. Although there was testimony that Moody smelled strongly of alcohol, he asserts that this alone cannot sustain his DWI conviction.

Moody states that this case is on point with *Stivers v. State*, 64 Ark. App. 113, 978 S.W.2d 749 (1998), a case in which this court reversed a DWI conviction notwithstanding that the appellant smelled of intoxicants. In *Stivers*, this court reversed a trial court's conviction for DWI and held that the only evidence to support the conviction was the fact that a one-car accident had occurred and that the defendant smelled of intoxicants. In that

8

decision, we noted that while the defendant was unresponsive to police officers, it was reasonable for the trial court to infer that the defendant's injuries, and not intoxication, caused his impaired response. We conclude, however, that this case is markedly different from *Stivers* and that Moody's DWI conviction was supported by substantial evidence.

In addition to smelling strongly of alcohol, there were additional factors to establish Moody's intoxication. Unlike *Stivers*, here there was ample testimony about Moody's driving, which included speeding up on cars, narrowly missing them, and passing one car on the shoulder shortly before the accident occurred.[2] *See Wortham v. State*, 65 Ark. App. 81, 985 S.W.2d 329 (1999) (affirming a DWI in part on the basis of observations that appellant weaved in and out of traffic and almost rear-ended another vehicle). Moreover, there was testimony that immediately after the accident occurred, Moody exited the van, then got back inside and attempted to speed away before crashing into a metal barrier. The supreme court has held that flight, or attempted flight, from the scene of a crime may be considered as proof of consciousness of guilt. *See Dorsey v. State*, 2020 Ark. 316, 607 S.W.3d 485. Witnesses at the accident scene testified that Moody was unsteady on his feet and appeared to be intoxicated, and Moody gave Officer Campbell nonsensical answers to her questions about what he was doing and where he was going that night. The supreme court has held that opinion testimony regarding intoxication is admissible. *Lockhart v. State*, 2017 Ark. 13, 508

_____

[2]Although Moody blamed his erratic driving on alleged mechanical malfunctions, it was for the jury to assess the credibility of the witnesses, and it was free to disbelieve his testimony. *See Ronk v. State*, 2016 Ark. App. 126.

9

S.W.3d 869. And finally, there was evidence that Moody refused to submit to a breathalyzer test. In *Lockhart*, the supreme court recognized that refusal to submit to a chemical test can be properly admitted as circumstantial evidence showing a knowledge or consciousness of guilt and that such evidence possesses independent relevance bearing on the issue of intoxication. In light of the evidence presented, we hold that there was substantial evidence that Moody was intoxicated and committed the offense of DWI.

## B. First-Degree Battery

A person commits first-degree battery if the person causes serious physical injury to another person under circumstances manifesting extreme indifference to the value of human life. Ark. Code Ann. § 5-13-201(a)(3) (Supp. 2021). Circumstances manifesting extreme indifference to the value of human life involve actions that create risk of death, which evidence the mental state to engage in some type of life-threatening activity against the victim. *Turner v. State*, 2019 Ark. App. 476, 588 S.W.3d 375. A person who operates an automobile while intoxicated does so under circumstances manifesting extreme indifference to human life. *Id.*

Moody concedes that the State proved that Sarah Hitchens sustained serious physical injuries. However, he argues that there was insufficient evidence that he acted under circumstances manifesting an extreme indifference to the value of human life, most notably because there was insufficient proof of his intoxication.

We reject Moody's argument because, as explained *supra*, there was substantial evidence that he operated the van while intoxicated. And in addition to the evidence of

Moody's intoxication, there was evidence that he drove erratically and at high speeds, narrowly missing other cars before his high-speed collision with the car in which the victim was a passenger. In *Turner*, 2019 Ark. App. 476, at 7, 588 S.W.3d at 379, we affirmed a first-degree-battery conviction, relying on evidence of the appellant's intoxication while operating a vehicle and stating:

> Furthermore, there was other evidence Turner was acting with extreme indifference to the value of human life at the time of the wreck. . . . [O]ther drivers on the road testified that he was driving his truck at such a high rate of speed it felt as though they were standing still; he swerved in and out of traffic on the road; and he crossed the center line, striking Nietch's vehicle head on and without any indication of an attempt to apply his brakes. These actions were practically certain to bring about the prohibited result—the head-on collision with Nietch while Turner was speeding and in Nietch's lane of traffic. The circuit court did not err in denying Turner's motion for directed verdict, and there is substantial evidence to support the jury's verdict.

We hold that on this record, substantial evidence supports Moody's conviction for first-degree battery.

### C. Refusal to Submit to a Chemical Test

Arkansas Code Annotated section 5-65-202(a)(2) (Supp. 2021) provides that if a person is involved in an accident while operating or in actual control of a motor vehicle, he or she is deemed to have given consent to a chemical test of his or her breath, saliva, or urine for the purpose of determining the alcohol concentration or controlled-substance content of his or her breath or blood. Arkansas Code Annotated section 5-65-205 (Supp. 2021) makes it unlawful to refuse to submit to a chemical test as provided in section 5-65-202.

Moody argues that his conviction for refusal to submit to a chemical test should be reversed because Officer Campbell lacked reasonable suspicion that Moody was intoxicated.

11

However, although Officer Campbell did have reasonable suspicion of Moody's intoxication, this was not required because Moody's implied consent to a chemical test was triggered under section 5-65-202(a)(2) because Moody was involved in an accident.

Moody also asserts that there was not substantial evidence that he refused a breath test because his alleged refusal was not videotaped and he did not sign the statement-of-rights form. We disagree. This was purely a matter of credibility for the jury to determine. Officer Campbell testified that she went over the statement-of-rights form with Moody and that Moody refused to take a breath test upon request; Moody testified that he did not refuse to take a breath test. This conflicting evidence was for the jury to resolve.

Finally, Moody appears to also argue that he was incapable of consenting or refusing to consent because of his diminished mental and physical condition while being detained at the jail. However, this specific argument is not preserved for review because it was not raised when Moody made his directed-verdict motions below. *See* Ark. R. Crim. P. 33.1(a) and (c); *Daniels v. State*, 2018 Ark. App. 334, 551 S.W.3d 428.

For these reasons, we hold that substantial evidence supports Moody's conviction for refusal to submit to a chemical test.

IV. *Conclusion*

In conclusion, we hold that there was substantial evidence to support Moody's convictions for DWI, first-degree battery, and refusal to submit to a chemical test. Therefore, all the convictions are affirmed.

Affirmed.

GRUBER and WOOD, JJ., agree.

*Hancock Law Firm*, by: *Charles Hancock*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.