Cite as 2023 Ark. App. 263

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CR-22-631

| | | |
|---|---|---|
| DOUGLAS LANGLOIS | | Opinion Delivered May 3, 2023 |
| | APPELLANT | |
| | | APPEAL FROM THE JEFFERSON COUNTY CIRCUIT COURT [NO. 35CR-20-70] |
| V. | | |
| | | HONORABLE ALEX GUYNN, JUDGE |
| STATE OF ARKANSAS | | |
| | APPELLEE | AFFIRMED |

**KENNETH S. HIXSON, Judge**

Appellant Douglas Langlois was convicted by a Jefferson County jury of one count of rape and one count of second-degree sexual assault committed against his stepdaughter Minor Child 1 (MC1), and one count of second-degree sexual assault committed against his stepdaughter Minor Child 2 (MC2). For these convictions, Langlois was sentenced to forty years in prison. Langlois now appeals, arguing that there was insufficient evidence to support his convictions because the testimony of the alleged victims was improbable and unbelievable. We affirm.

In relevant part, a person commits rape if he engages in sexual intercourse or deviate sexual activity with another person who is a minor and the actor is the victim's guardian. Ark. Code Ann. § 5-14-103(a)(4) (Supp. 2021). "Sexual intercourse" is penetration, however slight, of the labia majora by a penis. Ark. Code Ann. § 5-14-101(13). "Deviate sexual

activity" is defined as any act of sexual gratification involving (A) the penetration, however slight, of the anus or mouth of a person by the penis of another person; or (B) the penetration, however slight, of the labia majora or anus of a person by any body member or foreign instrument manipulated by another person. Ark. Code Ann. § 5-14-101(1).

In relevant part, a person commits second-degree sexual assault if the person, being eighteen years of age or older, engages in sexual contact with another person who is less than fourteen years of age. Ark. Code Ann. § 5-14-125. "Sexual contact" is defined as an act of sexual gratification involving the touching, directly or through clothing, of the sex organs, buttocks, or anus of a person or the breast of a female. Ark. Code Ann. § 5-14-101(12)(A).

In reviewing a sufficiency challenge, we assess the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Armstrong v. State*, 2020 Ark. 309, 607 S.W.3d 491. We will affirm a judgment of conviction if substantial evidence exists to support it. *Id.* Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Id.* Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Collins v. State*, 2021 Ark. 35, 617 S.W.3d 701. Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.* Further, the credibility of witnesses is an issue for the jury, not the court; the trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Armstrong, supra.*

MC1 testified that she is presently sixteen years old and that her sister, MC2, is thirteen. MC1 stated that her parents divorced when she was very young and that her mother married her stepfather, Douglas Langlois, when she was eight. MC1 stated that they moved in with Langlois and that they initially lived in the Sulphur Springs area of Watson Chapel, which is in Jefferson County. MC1 stated that Langlois was "pretty cool" at first but that about a year into the marriage he began yelling at her and threatening to put his hands on her.

MC1 stated that Langlois began touching her inappropriately in their Sulphur Springs home when she was nine. The first time it happened, they were alone in his bedroom and he asked her if she wanted to know about sex. MC1 said yes, and Langlois pulled her close to him and rubbed her buttocks and vagina with his fingers. MC1 stated that this made her feel "tingly." MC1 stated that this happened on many more occasions after that. MC1 stated that Langlois "eventually worked into showing me his penis." She described his penis as about five inches long when erect and having a piercing at the tip with a horseshoe-type ring.[1] MC1 stated that she did not tell anyone about any of this at that time because Langlois told her "it was [their] little secret"; that he was giving her money and candy; and that she was not getting yelled at as much.

---

[1] In MC1's mother's testimony, she confirmed that Langlois had a piercing and a horseshoe-type ring.

3

MC1 stated that when she was ten, Langlois "decided we were going to try something a little different." Langlois would put his fingers inside MC1's vagina and either wiggle them or pull them in and out. MC1 was pretty sure that this started in Sulphur Springs and stated that it continued after the family moved to Star City.[2] MC1 testified that Langlois "eventually put his penis inside and thus, stole my virginity." She stated that this happened when she was ten or eleven and that it hurt. MC1 stated that, after that, Langlois put his penis inside her vagina "too many times to count." According to MC1, Langlois would also penetrate her vagina with sex toys and have her perform oral sex on him. MC1 stated that these acts usually occurred when her mother was at work or running errands.

MC1 stated that the sexual abuse continued after they moved from Star City to Redfield.[3] MC1 stated that, shortly before they moved into their new house in Redfield, Langlois took her to the house, placed a broken-down cardboard box on the floor, and had sex with her. She stated that, after they moved to Redfield, Langlois continued to do "more of the [sexual] things that I've been telling you," including putting his penis inside her.

MC1 testified that sometime after they moved to Redfield, she became depressed and considered suicide. She also began to cut herself on her arms and thighs. MC1 was friends with the children of Sidney Marini, who was formerly a criminal investigator, and MC1 began spending as much time at Ms. Marini's house as she could, including spending the

---

[2]Star City is in Lincoln County.
[3]Redfield is in Jefferson County.

night, because she did not feel safe in her own home. She also stated that she started wearing baggy clothes in attempt to not "turn [Langlois] on."

MC1's mother and Langlois separated in November 2019 when MC1 was fourteen. About a week later, on November 25, 2019, MC1's mother noticed that MC1 was upset and asked her what was wrong. It was then that MC1 began crying uncontrollably and "told her everything" about what Langlois had done to her. MC1 testified that "at this point, I didn't figure there was anything to stop me, and I didn't want him to come back." After MC1 disclosed the sexual abuse, her mother took her to the police station and then to the Crimes Against Children Division of the Arkansas State Police, where MC1 disclosed the sexual abuse to investigators. MC1 also underwent a sexual-abuse physical examination. MC1 stated that the last time Langlois abused her was "maybe a half a month" before she reported the abuse, when he had her perform oral sex on him while parked on the side of the road in his truck. MC1 stated that after she disclosed the sexual abuse, later that day, her younger sister, MC2, also disclosed that she had been sexually abused by Langlois. This was the first time that MC1 was aware that Langlois had been abusing her sister.

When asked on cross-examination why she waited five years to report the sexual abuse, MC1 replied:

> Well, my explanation for not telling people was I believe they [would think] that I was lying, or even worse, not understanding. Because at the time, I did what I thought I was doing to protect my sister, and it was also partially a shame thing because I was scared they would see me differently.

5

MC2 testified next. MC2 stated that she gets along well with MC1 and that MC1 is her "best friend." MC2 stated that she did not know MC1 was being sexually abused by Langlois until after MC1 disclosed the abuse on November 25, 2019. After MC1 disclosed the abuse, MC1's mother asked MC2 if he had done anything inappropriate to her, and MC2 "replied with a simple yes." MC2 stated, "I figured that I had held it for a long amount of time and if my sister had the strength to do it, I did too."

MC2 described the sexual abuse as follows. She stated that "when she was seven or eight, [she] was molested." MC2 stated that Langlois would use his hands to touch and rub her vagina through her pants. She stated that this was intentional and that it occurred twice while they lived in Star City. After the second time, MC2 told Langlois that it was not right and that she would tell her mother if he did not stop. Langlois told MC2 not to tell her mother because if she did, they would end up breaking up. MC2 stated, "I generally thought of my mom as happy in [the marriage] and I didn't want her to [get] hurt, so I didn't say anything."

MC2 testified further that, multiple times throughout her mother's marriage to Langlois, he would touch and grab her buttocks. MC2 stated that this happened on numerous occasions in both Star City and in Redfield. She stated that during what was supposed to be a normal hug he would "reach down [her] back and grab her butt" and that his hands would stay there "for around five seconds." MC2 stated that she knew that this was intentional because Langlois had previously touched her inappropriately when he touched her vagina.

Shelley Langlois, the victims' mother, testified about the events that occurred on the day MC1 disclosed that she was being sexually abused. Shelley stated that "[MC1] just started crying and wouldn't tell me what was wrong." Upon further inquiry from her mother, MC1 stated, "I've got something I need to tell you," and "you're not going to like it." Shelley testified:

> And that's when she started telling me that he had done some really bad things to her. And I asked her, what things? And she went into an awful lot of detail, told me that he had touched her, that he had raped her in more ways than one and it happened multiple times. And I asked her, when did this happen? She said, "Every time you were gone."

Stacie Hipp testified that she is a nurse who performs sexual-assault examinations on children who are suspected victims. Ms. Hipp performed a physical examination of MC1 on the day the abuse was reported. Ms. Hipp noticed that MC1 had linear marks and scarring on her arms that appeared to be intentionally made as in the case of a child acting out. She identified these as "self-cutting marks" and stated that MC1 told her she had done this to herself. Ms. Hipp testified that the genital examination was normal and that she observed no injuries or evidence of penetrating trauma. However, she explained that this was not considered an acute examination, which would be an examination conducted within seventy-two hours of the rape or sexual assault. Ms. Hipp stated, "So it is very likely that anything that may have been there . . . at that time . . . I would not see that because the area had healed up." Ms. Hipp stated that she was not surprised that the exam was normal.

Based on this evidence, the jury convicted Langlois of one count of rape and one count of second-degree sexual assault committed against MC1, and one count of second-

degree sexual assault committed against MC2.  On appeal, Langlois challenges the sufficiency of the evidence to support these convictions.

Langlois, citing *Clayton v. State*, 2012 Ark. App. 199, acknowledges that normally a rape victim's uncorroborated testimony is sufficient to support a conviction.  Langlois, however, relies on *Conte v. State*, 2015 Ark. 220, 463 S.W.3d 686, where the supreme court stated that on review, the appellate court will disregard testimony that the jury has found credible only if it is so inherently improbable, physically impossible, or clearly unbelievable that reasonable minds could not differ about it.

Langlois states that there were no physical findings to support any allegation of sexual abuse, and the genital examination of MC1 was normal.  Langlois further asserts that neither of the alleged victims told anyone about the alleged abuse for several years and did not even tell each other despite being described in the testimony as "best friends."  Nor did either child witness the other child being abused.  Langlois contends that, had MC1 been sexually abused as she claimed, she would have likely told Sidney Marini, a family friend who is a former criminal investigator and whose home MC1 frequented.  Langlois posits that MC1's and MC2's testimony was fabricated, probably together, to rid themselves of a stepfather they despised.  For these reasons, Langlois contends that their testimony should be disregarded as clearly unbelievable and inherently improbable, and that therefore, all his convictions should be reversed for a lack of substantial evidence.

Our supreme court has consistently held that the uncorroborated testimony of the victim alone is sufficient to support a rape or sexual-assault conviction.  *Strawhacker v. State*,

2022 Ark. 134, 645 S.W.3d 326. Witness credibility is an issue for the fact-finder, who is free to believe all or a portion of any witness's testimony and whose duty it is to resolve questions of conflicting testimony and inconsistent evidence. *Id.* The jury may accept or reject testimony as it sees fit. *Caple v. State*, 2020 Ark. 340, 609 S.W.3d 630.

Applying these principles, we reject Langlois' sufficiency challenges and conclude that there was substantial evidence to support each conviction based on the victims' testimony. With respect to the rape conviction, MC1 testified that Langlois put his penis inside her vagina "too many times to count" and that this occurred at their last residence in Redfield, which is in Jefferson County. This testimony was clearly sufficient to support the jury's finding that Langlois, MC1's guardian, committed rape against MC1 by engaging in sexual intercourse with her while she was a minor. With respect to second-degree sexual assault committed against MC1, MC1 testified that when she was nine years old and living in Jefferson County, Langlois would rub her buttocks and vagina with his fingers. This was sufficient to establish that Langlois engaged in sexual contact with another person who was less than fourteen years of age. Finally, with respect to the second-degree sexual assault committed against MC2, MC2 (who was thirteen at the time of trial) testified that Langlois used his hands to touch and rub her vagina through her pants on two occasions when they lived in Star City and then on numerous occasions—including after they had moved to Redfield—would repeatedly and intentionally grab her buttocks for a period of about five

seconds at a time. This, too, was sufficient to establish that Langlois engaged in sexual contact with another person who was less than fourteen years of age.[4]

The following excerpt from the argument in Langlois's brief succinctly summarizes his arguments on appeal: Regardless of the evidence and testimony contained in the record on appeal, "[a]ppellant argues that it is both improbable and unbelievable that appellant performed any acts of a sexual nature on MC 1 or 2." We do not agree. Although the victims kept the sexual abuse to themselves and did not disclose it until after Langlois had separated from their mother, both victims gave plausible explanations for their delay in reporting the abuse. Moreover, the matter of the victims' credibility was exclusively within the province of the jury, and as stated, the victims' testimony amounted to substantial evidence to support all three convictions. For these reasons, all of Langlois' convictions are affirmed.

Affirmed.

VIRDEN and THYER, JJ., agree.

*Potts Law Office*, by: *Gary W. Potts*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Jason Michael Johnson*, Ass't Att'y Gen., for appellee.

---

[4]We observe that Langlois makes no argument on appeal that there was a failure of proof that these touchings were for the purpose of sexual gratification; he instead argues only that the alleged victims' testimony about the touchings was fabricated.