Cite as 2020 Ark. 309

# SUPREME COURT OF ARKANSAS

No. CR-19-745

| | | |
|---|---|---|
| | | **Opinion Delivered:** October 8, 2020 |
| MATTHEW ARMSTRONG | | |
| | APPELLANT | APPEAL FROM THE SEARCY COUNTY CIRCUIT COURT |
| V. | | [NOS. 65CR-18-26 AND 65CR-18-50] |
| STATE OF ARKANSAS | | HONORABLE H.G. FOSTER, JUDGE |
| | APPELLEE | |
| | | AFFIRMED. |

**COURTNEY RAE HUDSON, Associate Justice**

Appellant Matthew Armstrong appeals his convictions in the Searcy County Circuit Court for first-degree murder, first-degree escape, and employing a firearm to commit the murder. He received respective sentences of life, fifty years', and fifteen years' imprisonment, with all sentences to be served consecutively. For reversal, Armstrong argues that (1) he was denied assistance of counsel when the circuit court permitted him to be represented by an attorney with a suspended law license; (2) the circuit court erred in denying his motion for directed verdict on the first-degree-murder charge; (3) the circuit court erred by not instructing the jury on the lesser-included offenses of second-degree murder and manslaughter; and (4) the circuit court erred in refusing to allow into evidence certain text messages that were purportedly sent to him by the victim. We affirm.

On April 25, 2018, Armstrong was charged with the first-degree murder of Jessica Thornton and with using a firearm during the commission of the offense. He was

subsequently charged with first-degree escape after escaping from the custody of the Searcy County Detention Center on July 14, 2018.

The jury trial was held on April 25–26, 2019. According to the evidence presented at trial, police responded to a call from Armstrong about a shooting at approximately 10:00 a.m. on February 27, 2018. When Sheriff Joey Pruitt arrived at the location, Armstrong flagged him down and attempted to give directions to where the shooting had occurred. Pruitt instructed Armstrong to get in the car and observed that he had a lot of blood on his pants and on his hands. After driving through a gate to a nearby farm, Pruitt found Thornton's body behind a Nissan Rogue that was still running, with the hatchback and driver's-side door open. The victim was found facedown with a .45-caliber handgun under her right hand, a black rifle under her legs, and a broken, unlit cigarette in her left hand. The pistol's magazine was also found just above the victim's head. Thornton had a gunshot wound on the back, left side of her head and a large blunt-force-trauma injury to the top of her head. Inside the car, police found a chainsaw, a cell phone, a rifle case, a brown rifle, a spent shell casing underneath the driver's seat, and a live round underneath items on the passenger seat.

In his statement to police, Armstrong claimed that he was working on a nearby barn that was under construction when he heard a gunshot and Thornton yelling, demanding her chainsaw back. He stated that he placed the chainsaw in the rear of the vehicle and walked back toward the barn. Armstrong indicated that Thornton had a pistol in her hand and was waving it around and cursing at him. He then claimed that she went to the rear of her vehicle,

2

retrieved the rifle, and was holding it in one hand while she continued to wave the pistol around with her other hand. Armstrong stated that he was standing approximately eight feet away from Thornton when he looked down for a moment and heard a gunshot. He indicated that he ran to her and grabbed her head. Armstrong did not recall touching the rifle but stated that he may have moved the pistol out of her hand. He did not know why the magazine was ejected from the gun, speculating that he may have hit the release when he moved it away from Thornton. According to Armstrong, he had been in a romantic relationship with Thornton, although they had recently broken up. He stated that they remained on friendly terms, however, and that he had borrowed her chainsaw the day before and had been driving her vehicle.

Special Agent David Small with the Arkansas State Police testified that he was the lead investigator in the case and that the physical evidence found at the scene did not support Armstrong's claim that Thornton had committed suicide. For example, the pistol underneath the victim's right hand was covered in blood, with the exception of one small area near the barrel where there was a void. Small stated that it appeared something had been pressed on that spot. In addition, blood was found on top of the magazine that had been ejected from the pistol. According to Small, this evidence was not consistent with it falling out after the victim was shot. Further, there was blood on one of the live rounds inside the magazine. Small also pointed out that there was dirt on and underneath the victim's fingernails on her right hand even though it was on top of the pistol.

Dr. Jennifer Forsyth, the medical examiner who performed the autopsy on Thornton, testified that the victim had two prominent injuries—the gunshot wound and the laceration on her head. Forsyth stated that the gunshot wound was on the back, left side of Thornton's head and had an upward trajectory. She indicated that the gun had to have been at least twelve to eighteen inches away when it was fired because there was no evidence of powder burn on the wound. Forsyth further testified that the laceration, which was so deep that it exposed the skull, was caused by a blow from a blunt object, not by a fall. She explained that the injury from a terminal fall would be much smaller and would not extend to the bone. Accordingly, Forsyth classified the death as a homicide rather than a suicide.

Other evidence presented by the State showed that Armstrong's jeans tested positive for gunshot residue on both legs. Thornton's blood was also found on his jeans and on his shirt. The two shell casings recovered from the scene were determined to have come from the pistol.

With regard to Thornton's first-degree-escape charge, Blake Kelly, who was employed with the Searcy County Sheriff's Office, testified that he was working at the jail on July 14, 2018. As he was opening the gate to move inmates from one area to another, Kelly stated that Armstrong asked for a book. Kelly told him to wait a minute, and as soon as Kelly opened the gate, another inmate threw hot coffee on him, hit him in the chest, and restrained him, dislocating his shoulder in the process. Meanwhile, Armstrong and a second inmate escaped and were picked up at a location arranged by Armstrong and his girlfriend. The escapees were found several days later hiding in a church.

At the conclusion of the trial, the jury convicted Armstrong of all charges. He was sentenced as a habitual offender to life imprisonment for the first-degree-murder conviction and fifty years' imprisonment for the first-degree-escape conviction. His sentence was enhanced by fifteen years for his use of a firearm during the murder. The circuit court ordered all sentences to be served consecutively. The sentencing order was entered on April 26, 2019, and Armstrong filed a timely notice of appeal.

Although it is presented as his second point on appeal, we address Armstrong's challenge to the sufficiency of the evidence first due to double-jeopardy considerations. *Conte v. State*, 2015 Ark. 220, 463 S.W.3d 686. Armstrong argues that the circuit court erred in denying his motion for directed verdict on the charge of first-degree murder.[1] Specifically, he contends that the State failed to prove that he committed the murder with the requisite purposeful intent.

We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. *McCray v. State*, 2020 Ark. 172, 598 S.W.3d 509. In reviewing a sufficiency challenge, we assess the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Id.* We will affirm a judgment of conviction if substantial evidence exists to support it. *Mabry v. State*, 2020 Ark. 72, 594 S.W.3d 39. Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to

---

[1]Armstrong does not challenge on appeal the sufficiency of the evidence supporting his remaining convictions.

speculation or conjecture. *Id.* Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Howard v. State*, 2016 Ark. 434, 506 S.W.3d 843. Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.* Further, the credibility of witnesses is an issue for the jury, not the court; the trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.*

Pursuant to Arkansas Code Annotated section 5-10-102(a)(2) (Supp. 2019), a person commits murder in the first degree if, "[w]ith a purpose of causing the death of another person, the person causes the death of another person[.]" A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. Ark. Code Ann. § 5-2-202(1) (Repl. 2013). We have held that the purpose to commit a crime can be formed in an instant. *Drennan v. State*, 2018 Ark. 328, 559 S.W.3d 262. Intent is seldom capable of proof by direct evidence and must usually be inferred from the circumstances surrounding the killing. *McCray*, *supra*. The intent necessary for first-degree murder may be inferred from the type of weapon used, the manner of its use, and the nature, extent, and location of the wounds. *Halliburton v. State*, 2020 Ark. 101, 594 S.W.3d 856.

Contrary to Armstrong's contention, the State presented substantial evidence to support the jury's conclusion that he acted with purposeful intent in killing Thornton. First, investigators testified that the physical evidence did not support Armstrong's claim that she

committed suicide, particularly the blood pattern on the pistol and the blood found on top of the pistol's magazine and on a bullet from inside the magazine. Gunshot residue was found on both legs of Armstrong's jeans even though he indicated that he was standing eight feet away from her when the shot was fired. Also, the broken, unlit cigarette in the victim's left hand did not fit Armstrong's statement that she was holding the rifle in one hand and the pistol in the other at the time of the shooting. Second, the location and nature of the victim's wounds conflicted with Armstrong's story. The medical examiner testified that the gun was not fired at close range and that the gunshot wound was on the back, left side of Thornton's head, while the pistol was found next to her right hand. Even more significantly, the medical examiner stated that the deep wound on the top of Thornton's head was not caused by a fall but instead by a blow from a blunt-force object. Finally, in addition to his improbable explanation of the circumstances surrounding the shooting, Armstrong's escape from prison while awaiting trial can be considered as evidence of consciousness of guilt. *Howard*, *supra* (holding that efforts to conceal a crime and evade detection, along with false, improbable or contradictory statements to explain suspicious circumstances may be considered by the jury as evidence of guilt). Accordingly, we hold that substantial evidence supports Armstrong's conviction for first-degree murder.

Armstrong next argues that the circuit court erred by allowing him to be represented during his trial by an attorney with a suspended law license. He contends that he was effectively denied assistance of counsel in violation of the Arkansas Constitution and the Sixth Amendment to the United States Constitution.

At the conclusion of the second day of Armstrong's trial, while the jury was deliberating on the charges, the circuit court held an in camera hearing to discuss the information that it had learned the previous afternoon, which was that one of Armstrong's attorneys, Matt McKay, had had his law license suspended for failure to pay his annual license fee. The court stated that McKay, upon learning of this deficiency the day prior, immediately paid the fee and had his license automatically reinstated as of that morning. The circuit court indicated that this was only a technical violation and further noted that Armstrong was also represented during the trial by licensed co-counsel Camille Cashion. The circuit court stated that it had been very impressed by the defense's representation of Armstrong. Both the court and defense counsel inquired of Armstrong whether he had any questions or any issues with McKay's representation. Armstrong responded, "I don't have a problem at all with the way I've been working with him. No problem at all. I'm proud I have Mr. McKay as my attorney and her as well."

While Armstrong now contends on appeal that he was denied assistance of counsel due to the suspension of McKay's license during a portion of his trial, the State asserts that this argument is not preserved for our review. We agree. We will not consider arguments that are raised for the first time on appeal, including claims of ineffective assistance of counsel. *E.g., Chatmon v. State*, 2015 Ark. 28, 467 S.W.3d 731. Even constitutional arguments must first be raised to the circuit court and ruled upon in order to preserve the issue for appellate review. *Stover v. State*, 2017 Ark. 66, 511 S.W.3d 333. Although Armstrong argues that it would be unfair to hold that he waived this contention because McKay was in

8

no position to advise him of his rights or how to preserve the issue for appeal, McKay's license had already been reinstated when the in camera hearing occurred. Furthermore, as the circuit court found, Cashion also represented Armstrong during the proceedings, and Armstrong does not claim that she was not properly licensed. We affirm on this point.

Armstrong argues in his third point on appeal that the circuit court erred in denying his proffered jury instructions on the lesser-included offenses of second-degree murder and manslaughter. A circuit court's ruling on whether to give a jury instruction will not be reversed absent an abuse of discretion. *Dixon v. State*, 2019 Ark. 245, 581 S.W.3d 505. The refusal to give an instruction on a lesser-included offense is reversible error if the instruction is supported by even the slightest evidence; however, we will affirm the circuit court's decision to not give an instruction on a lesser-included offense if there is no rational basis for doing so. *Id.*

Armstrong proffered jury instructions on both second-degree murder and extreme-emotional-disturbance manslaughter. Second-degree murder, which is based on the defendant knowingly causing the death of another person under circumstances manifesting extreme indifference to the value of human life, is a lesser-included offense of first-degree murder, which is based upon the defendant causing the death of another person with the purpose of causing that death. *McCoy v. State*, 347 Ark. 913, 69 S.W.3d 430 (2002). We have also held that extreme-emotional-disturbance manslaughter is a lesser-included offense of first-degree murder. *See, e.g., Dixon, supra; Johnson v. State*, 2016 Ark. 156, 489 S.W.3d 668. A person commits this formulation of manslaughter if "[t]he person causes the death of

another person under circumstances that would be murder, except that he or she causes the death under the influence of extreme emotional disturbance for which there is reasonable excuse." Ark. Code Ann. § 5-10-104(a)(1)(A) (Repl. 2013). A jury instruction on extreme-emotional-disturbance manslaughter requires evidence that the defendant killed the victim following provocation such as "physical fighting, a threat, or a brandished weapon." *Johnson*, 2016 Ark. 156, at 5, 489 S.W.3d at 672.

The State argued, and the circuit court agreed, that there was no rational basis to give these lesser-included instructions when the only theory presented by the defense was that of complete denial. Armstrong did not introduce any evidence to show that he shot the victim but that the murder was committed in self-defense or under the influence of extreme emotional disturbance. Rather, he argued only that Thornton shot herself. We have held that no rational basis exists for giving a lesser-included instruction when the defense to the charge is a total denial of wrongdoing. *See, e.g.*, *Friar v. State*, 2016 Ark. 245 (affirming refusal to give lesser-included instructions on first- and second-degree murder where defense was that appellant was not the perpetrator of the shooting); *Brown v. State*, 321 Ark. 413, 903 S.W.2d 160 (1995), *cert. denied*, 524 U.S. 909 (1998) (holding that lesser-included-offense instruction for possession of controlled substance was properly rejected where appellant's entire defense was based on alibi theory); *Doby v. State*, 290 Ark. 408, 720 S.W.2d 694 (1986) (holding that there was no rational basis to give lesser-included-offense instruction where defense was that of innocence). Thus, the circuit court did not abuse its discretion in refusing Armstrong's proffered jury instructions in this case.

In Armstrong's fourth and final point on appeal, he contends that the circuit court erred in refusing to allow into evidence certain text messages that were allegedly from the victim. Circuit courts have broad discretion in deciding evidentiary issues, and their rulings on the admissibility of evidence are not reversed on appeal absent an abuse of discretion. *Collins v. State*, 2019 Ark. 110, 571 S.W.3d 469. Further, we will not reverse unless the appellant demonstrates that he was prejudiced by the evidentiary ruling. *Id.*

Armstrong called Special Agent Brandon Lofton with the Arkansas State Police to testify during an in camera hearing regarding text messages that Lofton recovered from cellular phones recovered during the murder investigation. Lofton, a forensic examiner, testified that he attempted to extract information from four cell phones submitted to him, although he was only able to recover data from two of them. From this data, Lofton prepared a logical file that contained information such as call logs, contact locations, and text messages.

In an attempt to authenticate the evidence, Lofton was first asked to read two messages, which stated "Hey, this is Matt. I just wanted you to have my number. If you have any work, just let me know[,]" and "This is Matt. Heard anything good?" Lofton was then asked to read five messages that were sent from a number that the owner of the phone had saved as "Jessica Thornton." These messages were sent the day of the shooting. The first message said, "I'm going to pistol whip your teeth out the next time I see you. I fucking hate your guts. I would rather cut them out of you and then fucking feed you a piece." The next message stated, "I'm coming to your house so you fucking better be there and not be lying

11

to me. I swear to God if you are not home, I will never trust you again." The third message said, "When I find you, I'm going to show you where I keep this pistol." The fourth message stated, "Where is my chainsaw? Do I need to report it stolen? I will right now." Finally, the fifth message that Lofton was asked to read said, "[Y]ou better hope I don't find you."

On cross-examination by the State, Lofton indicated that he did not know whose phone these text messages came from or any other details about who had possession of the phone before it was given to him. He further testified that he could not authenticate any person's name on the logical file. Lofton agreed that anyone could have programmed the phone to associate a name with a particular phone number and that the name programmed into the phone did not have to correspond with the person actually typing the message on the other end.

The circuit court rejected Armstrong's request that these text messages be properly authenticated and admitted into evidence, finding that there was insufficient context or other information to show the connection or foundation necessary to introduce them. The court also noted that Armstrong had picked only a few messages, which were out of context from the large number of other messages listed in the logical file.

Authentication of a document is a condition precedent to its admissibility. *Gulley v. State*, 2012 Ark. 368, 423 S.W.3d 569. Pursuant to Arkansas Rule of Evidence 901(a) (2019), "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." Rule 901(b) provides that the testimony of a witness

with knowledge that a matter is what it is claimed to be is sufficient to authenticate evidence and also that appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances, can be used to authenticate evidence. Ark. R. Evid. 901(b)(1) & (4).

In *Gulley*, which involved the admission of text messages, we addressed the appellant's argument that the authentication of electronic communications requires more than mere confirmation that a telephone number belongs to a particular person and that circumstantial evidence tending to corroborate the sender's identity is also required. *Gulley*, 2012 Ark. 368, at 15 n.4, 423 S.W.3d at 579 n.4. We noted that there was sufficient circumstantial evidence in that case to corroborate the identity of the sender where, in addition to evidence showing that the text messages came from a phone number assigned to the appellant, there was also witness testimony corroborating that fact and corroboration of the context and content of the messages. *Id.* at 13–15, 423 S.W.3d at 578–79.

While Armstrong argues that there was corroboration of certain references in the text messages, we agree with the circuit court that the messages were not properly authenticated. The only evidence that the texts were authored by Thornton was Lofton's testimony that her name was programmed on the phone as the sender. Unlike in *Gulley*, *supra*, no testimony or other evidence was presented to corroborate the sender's identity, and there was also no testimony as to the owner of the phone, where it was found, or who possessed it before Lofton received it. Further, the circuit court correctly noted that the messages lacked context because they were chosen out of a large number of messages culled from the phones that

were examined. Under these circumstances, the circuit court did not abuse its discretion in excluding the text messages at issue.

*Rule 4-3(i) Review*

Because Armstrong received a life sentence, the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Armstrong in compliance with Arkansas Supreme Court Rule 4-3(i), and no prejudicial error has been found.

Affirmed.

HART, J., dissents.

**JOSEPHINE LINKER HART, Justice, dissenting.** The circuit court abused its discretion by failing to instruct the jury on extreme-emotional-distress manslaughter and in excluding the proffered text messages sent by the victim to her former boyfriend, appellant Matthew Armstrong. This case should be reversed and remanded for a new trial.

As the majority correctly notes, refusal to give an instruction on a lesser-included offense is reversible error "if the instruction is supported by even the *slightest evidence.*" (Emphasis supplied.) *Dixon v. State*, 2019 Ark. 245, 581 S.W.3d 505; *Boyle v. State*, 363 Ark. 356, 214 S.W.3d 250 (2005); *Flowers v. State*, 362 Ark. 193, 208 S.W.3d 113 (2005); *Harshaw v. State*, 344 Ark. 129, 133, 39 S.W.3d 753, 755 (2001); *Rainey v. State*, 310 Ark. 419, 837 S.W.2d 453 (1992); *Henson v. State*, 296 Ark. 472, 757 S.W.2d 560 (1988). In the case before us, there is more than "slight" evidence to support a jury instruction for extreme-emotional-

14

distress manslaughter.

Extreme-emotional-distress manslaughter is codified under Arkansas Code Annotated section 5-10-104 as follows:

(a) A person commits manslaughter if:

(1)(A) The person causes the death of another person under circumstances that would be murder, except that he or she causes the death under the influence of extreme emotional disturbance for which there is reasonable excuse.

(B) The reasonableness of the excuse is determined from the viewpoint of a person in the actor's situation under the circumstances as the actor believed them to be.

This court has recognized that a jury instruction on extreme-emotional-disturbance manslaughter requires evidence that the defendant killed the victim following provocation such as "physical fighting, a threat, or a brandished weapon." *Johnson v. State*, 2016 Ark. 156, at 5, 489 S.W.3d 668, 672.

In the case before us, *all* of the evidence came in during the State's case-in-chief. Armstrong gave a Mirandized statement to Arkansas State Police Senior Special Agent Becky Vacco, which the majority credits in its sufficiency-of-the-evidence analysis. According to Agent Vacco, Armstrong told her that he was working at a job site when he heard a gunshot. Jessica Thornton appeared, "cussing and yelling at him, calling him names, and demanding her chainsaw back." Armstrong further stated that when he placed the chainsaw in Ms. Thornton's vehicle, he saw that she had a .45-caliber weapon in her hand. Ms. Thornton waved the handgun at him and at herself "and continued to cuss at him and yell and call him names and scream at him." Armstrong said that when he began to walk back toward

15

her, she opened the hatchback of her vehicle and retrieved a rifle. She continued to wave the .45 around while she held the rifle in her other hand. Agent Vacco described Armstrong's emotional state as he gave the statement as "quite elevated."

Armstrong's statement that the victim fired a shot from her vehicle was corroborated by police discovering a spent shell casing in her car. Lead investigator, Deputy David Small, testified that when he examined Ms. Thornton's body at the crime scene, the .45-caliber handgun was in her hand and a rifle was found under her lifeless body.

There was also evidence of a fight. Dr. Jennifer Forsyth, the medical examiner who performed the autopsy on the victim, testified that there was significant blunt-force trauma to the victim's skull that was administered before she was shot. This evidence is indicative of a physical altercation. Thus, in the case before us, there is evidence of physical fighting, a threat, *and* brandishing *two* weapons. Accordingly, Armstrong's proffered instruction on extreme-emotional-distress manslaughter should have been given to the jury.

As noted previously, Armstrong did not put on a case. His opening statement was reserved until after the State had rested. In his opening statement, Armstrong only held the State to its burden of proof. His trial counsel stated:

> Thank you for being here and thank you for listening to everything that's been presented in this case, first of all. And I just briefly want to remind everybody of what we're talking about here. The State has the burden of proof. It is a burden of proof beyond a reasonable doubt that Matthew Armstrong did what he is accused of doing. The defense has to prove absolutely nothing. And in reviewing that evidence, Mr. Armstrong is presumed innocent. But, again, the State has to meet their proof beyond any reasonable doubt. So in weighing all the evidence, I think we'll see that there is a reasonable doubt as to whether or not Matt Armstrong caused the death of Jessica Thornton as

16

well as to whether or not he committed the escape, as charged, in the first degree. Thank you.

For this reason, the majority's reliance on *Johnson v. State*, is clearly misplaced. The *Johnson* court held that there was "no factual basis to show that Johnson killed Officer Ester in a moment following provocation." *Id.* The court rejects Johnson's motivation for the murder--Officer Ester came to his barracks with Lieutenant Lane to confiscate his shoes-- as the type of "provocation" required for the instruction. *Id.* The *Johnson* court stated that confiscating his shoes "was not in the form of physical fighting, a threat, or a brandished weapon" that was required in prior caselaw. *Id.* The court further stated "Johnson's own testimony partially contradicted his argument that he was provoked" because Johnson testified that he had retrieved the murder weapon after Officer Ester had gone to get Lieutenant Lane, which was before they attempted to confiscate Johnson's shoes. *Id.* The *Johnson* court further rejected the appellant's argument that prison is stressful and that a reasonable person would do the same thing as a rational basis for giving the instruction. In the case before us, there clearly was evidence of provocation in the form of physical fighting, threats, and the brandishing of weapons. Also, because Armstrong did not testify, he did not diminish his entitlement to the instruction as Johnson did.

This case should be reversed and remanded for a new trial. In our criminal justice system, it is up to the jury to assess the level of criminal responsibility in a given situation. Due process requires that a jury be fully instructed so that it can make the just and correct decision. Considering that maintaining a prisoner in maximum security prison costs the

taxpayers more than three times what we require our schools to spend to educate our children and more than twice what is charged for tuition in our flagship university, it is obvious that the State has no interest in a prison for even a day longer than justice demands.

In my view, the circuit court also erred in excluding the proffered text messages that Ms. Thornton purportedly sent to Armstrong. At trial, the State successfully argued to the circuit court that addressing the message to "Matt" was insufficient to identify Matthew Armstrong as the intended recipient because the name "Matt" was not definite enough to narrow the recipients down to Armstrong. Armstrong argued at trial that authentication could be derived from the surrounding circumstances like the fact that Ms. Thornton came to Armstrong's job site to retrieve her chainsaw. While the majority correctly notes that pursuant to Rule 901(b) of the Arkansas Rules of Evidence, authentication can be made by "appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances," it fails to consider the unique circumstances that provide authentication.

The testimony of Special Agent Brandon Lofton with the Arkansas State Police, who examined a cell phone found in Ms. Thornton's car, was a required witness because he retrieved the messages. The context was provided not only by the messages themselves, but also by the State's case-in-chief. First, "Matt" is the commonly accepted shortened form of Armstrong's given name, Matthew. The messages, sent to "Matt," who previously had a romantic relationship with Ms. Thornton, refer to Ms. Thornton's concern over the return of her chainsaw. Crime scene investigators found the chainsaw in the back of Ms. Thornton's

18

vehicle. To use the State's argument at trial, how many chainsaws could Ms. Thornton possibly have lent to individuals named Matt? The evidence further indicated that there was a physical altercation between the only individuals present--Ms. Thornton and Armstrong. Finally, some of the proffered messages suggested a violent confrontation was in the offing. Dr. Forsyth's testimony provided the context for authenticating those messages. While I am mindful that the case before us is not factually identical to *Gulley v. State*, 2012 Ark. 368, 423 S.W.3d 569, it is simply a logical fallacy to assert that the fact pattern in that worthy precedent is the only way Rule 901 can be satisfied.

For the foregoing reasons, this case should be reversed and remanded for a new trial. I dissent.

*Cross, Gunter, Witherspoon & Galchus, P.C.*, by: *Misty Wilson Borkowski*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Christopher R. Warthen*, Ass't Att'y Gen., for appellee.