Cite as 2025 Ark. App. 520

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CR-24-806

| | | |
|---|---|---|
| KEVIN SPANN | | **Opinion Delivered** October 29, 2025 |
| | APPELLANT | |
| | | APPEAL FROM THE CLEBURNE |
| V. | | COUNTY CIRCUIT COURT |
| | | [NO. 12CR-23-205] |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE TIM WEAVER, |
| | | JUDGE |
| | | |
| | | AFFIRMED |

**KENNETH S. HIXSON, Judge**

Appellant Kevin Spann appeals after he was convicted by the Cleburne County Circuit Court of terroristic act and third-degree domestic battery after a bench trial. He was sentenced to serve an aggregate of sixty months' incarceration. On appeal, appellant contends that there was insufficient evidence to convict him of having committed a terroristic act. We affirm.

I. *Relevant Facts*

October 14, 2023, appellant fought with his wife, Lesley Casey. Ms. Casey explained that appellant pinned her down on the bed, grabbed her by her hair, bit her lip, and threatened to kill her. Ms. Casey was able to escape and said that as she fled the home, she heard gunshots from inside the home. She hid in the woods for a few hours before returning to the home and saw that appellant was asleep. She later woke appellant and confronted

him about the incident.  Appellant told her that he wanted a divorce and planned to kill himself.  Thereafter, Ms. Casey left the home, called 911, and met with law enforcement.  Appellant was later arrested and charged by criminal information with terroristic act in violation of Arkansas Code Annotated section 5-13-310(a)(2)(b)(1) (Repl. 2013), a Class B felony; aggravated assault on a family member in violation of Arkansas Code Annotated section 5-26-306(a)(2)(b) (Supp. 2023), a Class D felony; and third-degree domestic battery in violation of Arkansas Code Annotated section 5-26-305(a)(1)(B)(1) (Supp. 2023), a Class A misdemeanor.  A bench trial was held on August 23, 2024.

At trial, Officer Andrew Davidson testified that he was dispatched to respond to Ms. Casey's call that appellant was intoxicated and threatening to kill himself.  He met her at a gas station and saw that she had a swollen lip.  Ms. Casey told him about the incident with appellant that occurred between midnight and 2:00 a.m. that same day.  After his meeting with Ms. Casey, Officer Davidson went to appellant's home to speak with appellant.  After advising appellant of his *Miranda* rights, appellant spoke with Officer Davidson, and a portion of the interview that was recorded on Officer Davidson's body cam was played for the circuit court.  In the interview, appellant stated that he had drunk alcohol the night before and did not remember anything that happened because he had "blacked out."  He said he did not remember Ms. Casey leaving the home.  Appellant admitted that Ms. Casey spoke with him that morning and that he told her he was going to commit suicide.  When Officer Davidson asked appellant whether he fired any guns, appellant responded, "If she says I did, I did."

2

Sergeant Asa Ladd testified that he was dispatched along with Officer Davidson to respond to Ms. Casey's call. When they met Ms. Casey at a gas station, Sergeant Ladd saw that Ms. Casey had a swollen jaw, a cut on her lip, and blood on her face. Her eyes were also very swollen from crying, and she looked scared. Ms. Casey told them that appellant slammed her head into the wall after "becoming angry at the TV." Appellant then got on top of her and bit her lip. Ms. Casey fled from the upstairs bedroom through a "Jack and Jill bathroom" into an adjoining room and then down the stairs where she exited the back door of the home. She heard gunshots as she fled into the woods, where she hid for several hours.

Sergeant Ladd obtained a search warrant to search the inside of appellant's home. Pictures of the home were admitted into evidence. An "AK style rifle" was found underneath a couch in the living room, and blood was found on the sheets in the upstairs bedroom. Sergeant Ladd also found seven spent shell casings and evidence of gunpowder residue and bullet impacts upstairs. He did not find any spent casings or evidence of gunshots being fired outside the home. There was "evidence of bullet impacts in the wall" that went from inside the bedroom and into the bathroom in the path that Ms. Casey stated she had fled. Although two firearms were eventually found in the home, Sergeant Ladd stated that the shots that occurred in the bedroom originated from the "AK style rifle."

On cross-examination, Sergeant Ladd recalled that Ms. Casey told him that appellant had a gun and that he slept on the couch with it. He did not remember her saying that appellant pointed or threatened her with the gun during the incident. Ms. Casey told him

3

she had made it outside before she heard the gunshots coming from inside the home. Sergeant Ladd reiterated that there were at least seven shots fired inside the home. Shots were fired from inside the bedroom into the ceiling, toward the bathroom, and toward the staircase. He did not know the order in which the shots were fired.

Ms. Casey testified that she was still married to appellant at the time of the incident. On the night of October 13, 2023, she went to sleep around 7:30 or 8:00 p.m. Appellant stayed up watching television and drinking. Ms. Casey woke up around 12:30 a.m., walked downstairs, and sat on the couch with appellant after appellant asked her to watch television with him. At that time, he was treating her in a loving manner, patting her leg and stating that he loved her. However, Ms. Casey recalled the following events after appellant heard on television that a soccer player had been traded:

> And [appellant] said – and I did not realize in the time that I had been in bed from 7:30 until 12:30 that he had been consistently drinking scotch until this moment. But he said, do you know what I would do if I were that man. And he turned and looked at me with an expression I have never seen. And he said I would take him down to the lake. We lived on the lake. And he started at me. He came toward me. And I said, what are ~ we're not even fighting. What is wrong. And I got up to run and he knocked me into the bookcase. And I ran upstairs. The reason I ran upstairs is because this is not a lone incident. We have a history of ~ there was a history of him of abusive behavior in the past. And when I realized that he's had scotch, usually if I go upstairs and go to bed he would leave me alone. . . . So, I ran to the bedroom. And I was in pajamas, socks. Ran to the bedroom. And laid down. Pulled the covers up hoping he would not come upstairs and he would stay downstairs since he was inebriated. He proceeded to come up the stairs. And had me pinned down. And there were things that happened that aren't in the report because of the elevated state that I was in at the time he asked me to write all of that. But he had me by the hair like above my ears. Right here. And he was on top of me on the bed. And he was trying to bite my face. And he got me on the lip. And he took his thumbs and tried to poke my eyes out. He told me that he was ~ he told me that he was going to kill me. That I was going to die before the night was over. And that he was going to kill

4

my son and my granddaughter. And he punched me in the face with a closed fist. Obviously that was my blood on the bed. I [don't] know whose else it would have been. And had he not been in the state that he was in, as far as how much alcohol he had, I'm not sure that I could have wiggled out from under him. But I did. I knocked him off of me. Onto the side of the bed where the master bedroom door is. So, when I got up I ran the opposite way through the Jack and Jill bathroom, through that bedroom and knocked the mirror down. Ran down the stairs. And out the back door in pajamas with socks. No phone. No keys. No purse. I had nothing. And there's a house beside us. And I ran and I was leaving I could hear ~ and this is not new either. That when he would get inebriated or mad, he would pull up the AK and shoot. Whether I was ~ sometimes I was in the room. Sometimes I was not in the room. Yes, I probably ~ I should have ~ I should have blown the whistle a long time ago. But I did not out of fear because he had threatened to kill me and then kill himself. Or go ahead, hand me the phone. Go ahead and dial 9-1-1. I'll shoot every policeman that comes here. And so, I heard shots. . . . I know that I had exited the house. I don't know exactly where I was. I wasn't running fast because we have gravel and I had on socks. So, I know that I was ~ I wasn't in the woods crouched down yet. But I was heading toward the woods on the other side of our neighbor's house. And I laid down in the rocks and I was so terrified. I wet myself. I was trying to hold my breath. I could hear him outside. I know that he shot outside. I don't know where the casing would be. I don't know if he walked down toward the lake. Obviously it wasn't on the deck. But I heard shots both places. And I laid there for probably at least two hours. And because being married to him for almost two years I know his pattern is that when he drinks he will pass out. So at 4:30 in the morning I was freezing cold. I went in the house. I snuck in. He did not ~ he was passed out on the couch or asleep. He didn't know I was in the house. I went to a bedroom and laid down to get some rest. And then when I woke up in the daylight I could see the damage in the house.

Ms. Casey further explained that she then went downstairs and saw appellant asleep on the couch with the rifle pointed at his chin. She woke appellant and confronted him about the incident. She said that appellant told her he wanted a divorce and planned to kill himself. She left the home and called 9-1-1. The domestic violence lethality screen that consisted of questions law enforcement asked Ms. Casey was admitted into evidence. Ms. Casey testified that appellant's mother owned their home but that appellant's mother

planned to leave the home to appellant upon her death. Ms. Casey admitted that appellant had shot his gun inside the home before the night of the incident but that none of the bullet holes discussed were present before that night. She recalled another time that appellant had shot over her head. Ms. Casey explained that she did not report that incident because she did want appellant to get in trouble and because she was afraid of the consequences she may suffer. She said that she called law enforcement after this incident because appellant was threatening suicide, and she wanted him to get the help he needed.

After the State rested, appellant moved to dismiss all counts. Relevant to the issue on appeal, appellant argued that there was insufficient evidence to support the offense of terroristic act. He specifically argued that there was no evidence that his purpose was to cause injury to Ms. Casey when discharging a weapon during the course of this incident. He further argued that his purpose could not have been to cause damage to property because a person has a right to damage his or her own property. The circuit court denied the motion on all counts.

Rosalie Spann, appellant's mother, testified on appellant's behalf. She said that, other than Ms. Casey, appellant was the only one who had lived in the home where the incident took place for the past ten years. Appellant pays for all taxes, utilities, upkeep, and maintenance of the home. Although there was no lease agreement, Ms. Spann stated that she considered the home to be appellant's and did not feel like she could "come and go" any time she pleased. That said, Ms. Spann admitted on cross-examination that her name is on the deed to the home until her death.

6

Appellant rested and renewed his motion to dismiss, which the circuit court denied. After hearing closing arguments, the circuit court found that the State had failed to meet its burden of proving aggravated assault on a family member and dismissed that charge. It found appellant guilty of terroristic act and third-degree domestic battery. Regarding terroristic act, the circuit court provided the following explanation for its decision:

> A person commits a terroristic act if while not in the commission of a lawful act, and there's no question there was no lawful act that he was in commission of, shoots an occupiable structure with the purpose to cause injury to a person.
>
> And let's just forget about damage to property. To a person. Here's the evidence before this Court. This Court is -- there was -- the only evidence before this Court is there was some unprovoked violence on the behalf of the defendant toward Ms. Casey. He threatened to kill her. Held her down on the bed. Battered her. Pulled her hair. Bit her lip. She gets up. She does not have to wait. There's nothing in this statute that requires, well, you better wait and see if he gets a gun and starts shooting that -- before the State can prove this case. Because if that had happened we probably wouldn't be here. But the testimony was she immediately fled. And in the time it took her to run, at no point did she testify that she walked -- causally walked out of that house. She ran across gravel. Then she hears some gunshots. That can't be 15 minutes. That can't be five minutes. That's within a matter of a minute, two minutes, at the most. He shoots at least seven rounds. And at least some of them are in the direction that she fled. There's no question, when you pull the trigger on a firearm, particularly a 7.62 millimeter, that's a big round. That's a heavy round. And you see what it does. It goes through walls. They go through houses without stopping. When you do that and you do not know -- he had no way of knowing that she wasn't on the other side of one of those walls. Absolutely no way of knowing that.
>
> This is by definition a very definition of a terroristic act. And I find the State has proven beyond a reasonable doubt that Mr. Spann has, in fact, violated Arkansas Code Annotated 5-13-310(a)(2)(b)(1), a Class B felony. And I find the State has proven that beyond a reasonable doubt.

Appellant was sentenced to serve an aggregate of sixty months' incarceration. This appeal followed.

7

## II. *Sufficiency of the Evidence*

We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Armstrong v. State*, 2020 Ark. 309, 607 S.W.3d 491. In reviewing a sufficiency challenge, we assess the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Id.* We will affirm a judgment of conviction if substantial evidence exists to support it. *Id.* Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion without resorting to speculation or conjecture. *Id.* Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Collins v. State*, 2021 Ark. 35, 617 S.W.3d 701. Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.* Further, the credibility of witnesses is an issue for the jury, not the court; the trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Armstrong, supra.*

This court has noted that a criminal defendant's intent or state of mind is seldom apparent. *Benton v. State*, 2020 Ark. App. 223, 599 S.W.3d 353. One's intent or purpose, being a state of mind, can seldom be positively known to others, so it ordinarily cannot be shown by direct evidence but may be inferred from the facts and circumstances. *Id.* Because intent cannot be proved by direct evidence, the fact-finder is allowed to draw on common knowledge and experience to infer it from the circumstances. *Id.* Because of the difficulty

in ascertaining a defendant's intent or state of mind, a presumption exists that a person intends the natural and probable consequences of his or her acts. *Id.*

"A person commits a terroristic act if, while not in the commission of a lawful act, the person . . . [s]hoots at an occupiable structure with the purpose to cause injury to a person or damage to property." Ark. Code Ann. § 5-13-310(a). "A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result[.]" Ark. Code Ann. § 5-2-202(1) (Repl. 2013).

On appeal, appellant challenges the sufficiency of the evidence to support his conviction for terroristic act. He argues as he did below that there was insufficient proof of his intent to injure Ms. Casey because there was no evidence "that [appellant] knew or believed that [Ms. Casey] was upstairs when he fired the shots."[1] He explains that Ms. Casey was no longer in the home when she heard the gunshots and claims that "[h]e *may* have checked to make sure she was not upstairs before firing." (Emphasis added.) However, appellant's argument ignores the other testimony presented from which the circuit court could infer his intent. Ms. Casey testified that appellant pinned her down on the bed, grabbed her by her hair, bit her lip, and tried to "poke [her] eyes out." Appellant told Ms.

---

[1]To the extent appellant argues that there was insufficient proof that he damaged property within the meaning of the terroristic-act statute, the circuit court made it clear that appellant's conviction for terroristic act was not based on appellant's intent to damage property but based on appellant's intent to injure Ms. Casey. Accordingly, we do not address appellant's damaged-property argument.

Casey that he was going to kill her and that she "was going to die before the night was over." Within minutes of threatening to kill her, appellant fired at least seven times in the direction that Ms. Casey was fleeing. Although Ms. Casey ended up escaping and hiding in the woods, appellant told Officer Davidson that he did not know she had left the home. We agree with the State that this evidence constituted substantial evidence from which the circuit court could reasonably conclude, without resort to speculation and conjecture, that appellant fired shots inside their home with the purpose of injuring Ms. Casey. Thus, viewing the evidence in the light most favorable to the State, we hold that substantial evidence supports the verdict and affirm.

Affirmed.

GLADWIN and MURPHY, JJ., agree.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Jacob Jones*, Ass't Att'y Gen., for appellee.