Cite as 2026 Ark. App. 342

# ARKANSAS COURT OF APPEALS

DIVISION II
№ CR-25-666

| | |
|---|---|
| | **Opinion Delivered** May 20, 2026 |
| CHRISTIN HELMS | |
| APPELLANT | APPEAL FROM THE CRAIGHEAD COUNTY CIRCUIT COURT, WESTERN DISTRICT |
| V. | [NO. 16JCR-21-488] |
| STATE OF ARKANSAS | HONORABLE CHRIS THYER, JUDGE |
| APPELLEE | |
| | AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellant Christin Helms was convicted in a jury trial of criminal attempt to commit first-degree murder and first-degree endangering the welfare of a minor, and she was sentenced to consecutive prison terms of thirty years and six years. The victim was Helms's twelve-year-old daughter, MV, who testified that Helms was driving her car with MV as a passenger when she became angry with MV because MV had lost Helms's wallet, after which Helms tried to kill them both by intentionally swerving off the road and crashing into a tree. On appeal, Helms argues that there was insufficient evidence to support either conviction. We affirm.

I. *Applicable Law and Standard of Review*

Pursuant to Arkansas Code Annotated section 5-10-102(a)(2) (Supp. 2025), a person commits first-degree murder if, with the purpose of causing the death of another person, the

person causes the death of another person. A person attempts to commit an offense if he or she purposely engages in conduct that constitutes a substantial step in a course of conduct intended to culminate in the commission of an offense whether or not the attendant circumstances are as the person believes them to be. Ark. Code Ann. § 5-3-201(a)(2) (Repl. 2024). Pursuant to Arkansas Code Annotated section 5-27-205(a)(1) (Repl. 2024), a person commits first-degree endangering the welfare of a minor if, being a parent, he or she purposely engages in conduct creating a substantial risk of death or serious physical injury to a minor.

In reviewing a challenge to the sufficiency of the evidence, we assess the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Armstrong v. State*, 2020 Ark. 309, 607 S.W.3d 491. We will affirm a conviction if substantial evidence exists to support it. *Id.* Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Id.* Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Collins v. State*, 2021 Ark. 35, 617 S.W.3d 701. Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.* Further, the credibility of witnesses is an issue for the jury, not the court; the trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Armstrong, supra.*

II. *Relevant Facts*

2

In March 2021, Helms and MV were living in a house with several people, which included Helms's longtime boyfriend, Cameron Stricklin, and Helms's other two children. At the time, Helms and Stricklin were both unemployed. On March 9, 2021, Helms drove her 2005 Jeep Liberty to Sam's Club, with MV riding as a passenger, to buy groceries. After buying groceries, they returned to the parking lot, and Helms handed MV her wallet as Helms put the groceries in the car. As the groceries were being put in the car, MV placed Helms's wallet on top of the car, and Helms drove away. When they realized the wallet was missing, they returned to Sam's Club but could not find it. Helms then drove back in the direction of where they were staying, swerved off the road, and crashed the car head-on into a tree.

Norma Clairday came upon the wreck shortly after it happened and called 911. Clairday described it as a "really bad accident" with injuries to the driver and passenger. In the 911 call, Clairday stated, "We have a little boy out of the car and says his mother did this on purpose."[1] Clairday stated further that "he was in a panic because he didn't know how to reach his dad."

Helms's boyfriend, Cameron Stricklin, testified that he is the father of Helms's other two children and that he is like a stepdad to MV. On the day of the wreck, Cameron was at the house where they were staying playing video games with a group of people when he received a phone call from Helms. According to Stricklin, Helms was upset because she had

---

[1]Because MV's hair was short at the time, some of the witnesses at the accident scene mistook her for a boy.

3

lost her wallet. Stricklin stated that Helms was hysterical and crying and told him she was going to leave him because he was not able to take care of their financial responsibilities. Because his phone was on speaker and everyone in the room could hear, he became embarrassed and hung up. Stricklin testified that during their phone conversation, he did not hear Helms say anything about being angry enough to end her life or MV's life. A couple of hours later, Stricklin got a call from Helms's mother informing him of the wreck. During the investigation, Stricklin was interviewed by the police, and he stated in the interview that MV would not lie.

On cross-examination, Stricklin stated that Helms had bought the 2005 Jeep Liberty just a few weeks before the wreck and that the car had mechanical issues. Stricklin stated that he had driven the car a couple weeks prior and that during turns or bumps "you could hear a clack or a thud." He stated further that, every once in a while, the car would "buckle a little like something was ajar" and "you'd have to force it back on the road and try to make it jerk back to go in line." He also stated that these problems became worse over time. On redirect examination, Stricklin was asked about the brakes, and he stated that they "had a little squeak" but that you could "still hit the brakes" to stop the car.

Paramedic Johnny Harper responded to the wreck that day. When he arrived, MV was already out of the car, and he tended to her injuries. Harper testified that MV was alert and oriented and told him that "her and her mother had been arguing and her mother got mad at her and intentionally swerved off the road and hit a tree."

Officer John Porbeck of the Jonesboro Police Department testified next. Officer Porbeck stated that on March 9, 2021, a citizen found Helms's wallet and turned it into the police.

Hailey Clifton is an emergency-room nurse at St. Bernards Medical Center, where MV was transported for treatment. Nurse Clifton testified that MV was in significant trauma and had a spleen laceration, low-back fracture, and two fractured ribs. Because of MV's injuries, she was taken to Le Bonheur Children's Hospital in Memphis, where she was admitted for three days.

Investigator David Bailey of the Craighead County Sheriff's Department was assigned to investigate the wreck, and he spoke with MV at St. Bernards Medical Center. Investigator Bailey stated that MV appeared to be in a lot of pain but was very calm. Investigator Bailey testified:

> [MV] told me that her mother, Christin Helms, and her had gone shopping in Jonesboro and that whenever they left a store in Jonesboro and loaded up groceries and items, that [MV] accidentally left Ms. Helms's wallet laying on the outside of the vehicle. And she advised that shortly after they left the Sam's Club parking lot she remembered and she told her mother about it. And then her mother got upset. They turned around and went back to try to find the wallet at Sam's and on the roadway . . . and they were unsuccessful in finding the wallet. At that time, [MV] said that they proceeded to head toward Harrisburg, Arkansas, where they were staying with friends and that along the way her mother got really agitated and yelled at [MV] and told her she had lost everything that she had and that she was going to drive off the road and wreck them intentionally and try to kill them. [MV] told me that at that point, Ms. Helms called her boyfriend, Mr. Stricklin, and told him to tell the other kids that she loved them and goodbye and that she was really upset when she was talking to him. [Ms. Helms] hung up and right after that, she drove off the roadway, head-on into a tree.

Investigator Bailey stated that after speaking with MV, he went to the scene of the wreck to investigate. Investigator Bailey stated that he is trained in motor-vehicle crash investigations and has assisted with hundreds of vehicle crashes. When he arrived, the crashed vehicle was still on the scene and had not been moved. Investigator Bailey took multiple photographs of the roadway, roadside, and crashed vehicle and drew a conclusion from his observations. Investigator Bailey stated that the front of the vehicle was "completely caved in and basically centered the tree head-on." He stated that there were plainly two curved black yaw marks (marks made when a vehicle makes a sharp turn at a high rate of speed) visible from where the vehicle had turned and left the roadway. Investigator Bailey stated that with most accidents you would see brake marks on the pavement or gouges in the grass or leaves from where the driver attempted to brake, but there were no such findings here, and it did not appear the brakes were applied before impact. He also stated that there were no signs of anything dragging into the pavement or roadside to suggest that anything had broken loose from the vehicle before the crash. Investigator Bailey stated that, from his training and experience and his investigation, the crash appeared to be intentional.

Investigator Bailey also testified that he conducted a Mirandized interview of Helms as part of his investigation. In that interview, Helms stated that she had no memory whatsoever of the accident. Investigator Bailey stated that he asked Helms whether MV would lie about the wreck, and Helms stated that "[MV] would not lie and that she would not keep up a lie," which he took to mean that "[MV] wouldn't keep up with continuing telling something false."

MV testified next. MV stated that on March 9, 2021, she went with her mother to go grocery shopping at Sam's Club. MV stated that her mother had acquired the car a few months prior and that she did not recall the car having any issues or making any weird noises on that day or at any time before that day. MV stated that everything seemed normal that day, and as her mother was loading the groceries into the car in the Sam's Club parking lot, her mother handed MV her wallet. MV set the wallet on the top of the car and helped load the groceries. Then they left and went to Krispy Kreme to buy coffee and doughnuts, which is when they realized the wallet was missing. MV's mother became upset and drove back to Sam's Club to look for the wallet in the parking lot, and they also went inside the store and asked if a wallet had been found. When they could not find the wallet, they got back into the car and Helms drove off.

According to MV, her mother became more and more upset, she was driving faster and faster, and she was yelling at MV for losing her wallet, which her mother said "had everything in it" and was "irreplaceable." Helms also reached over and hit MV a few times, causing MV to scoot as close to the passenger door as she could to move away from Helms. MV testified, "Then at some point, she says that she is going to kill me and her both because I didn't deserve to live and if I was going to die, she was going to die with me." MV testified that she was terrified. MV stated that her mother called her boyfriend on the phone and "she tells him that she's going to wreck the car with both of us in it, because I didn't deserve to live and she tells him to tell both of my brothers that she loves them." MV stated that her

7

mother kept driving, upset, for a few more minutes and then MV "felt the car jerk to the left like it had been pulled and then everything went black."

MV stated that after the crash she was having trouble breathing but managed to pull herself out of the car. MV stated that when the emergency personnel arrived to assist, she told them she had lost her mother's wallet; that her mother got upset with her; and that her mother had crashed the car on purpose and tried to kill them both.

Officer Tanner Middlecoff of the Arkansas State Police was the final witness for the State. Officer Middlecoff responded to the crash and completed an incident report. Officer Middlecoff stated that during his investigation of the crash, he observed the yaw marks in the road, which indicated "quite a bit of steering input to make that turn . . . from the operator." Officer Middlecoff saw no evidence of any braking or attempts at correction. Officer Middlecoff also stated that during his investigation he spoke with MV, who told him that her mother was upset about a missing wallet and "said that she would wreck them."

Cameron Stricklin was re-called to testify as a defense witness. Stricklin stated that during his phone conversation with Helms on the day of the wreck, he never heard her say anything that caused him concern for Helms's or MV's safety and that, had she said anything like that, he would have called someone and made it known. Stricklin also gave testimony about the alleged defects with Helms's car and stated that when the car would jerk its hardest it would take him "about 50 percent effort" to correct it, and so it probably took "just about every bit of what" Helms had. Stricklin also testified that there was never a time when he drove the vehicle that it did not stop when he hit the brakes.

8

Helms testified on her own behalf. Helms remembered going to Sam's Club that day, and she remembered losing her wallet and getting mad. She stated, however, that she had no recollection of being in a car wreck, although she also stated that the car's tie rod broke that day.[2] Helms stated that she is legally blind in her right eye and that because of the wreck, her "left temporal and frontal lobe was crushed," causing memory problems. Helms acknowledged that during a police interview, she said MV would not lie, and she testified, "She wouldn't lie. There's no reason for her to lie." Helms also testified that "all children lie" and "all people lie." Helms testified:

> I did not try to kill us over a wallet, I promise. . . . I was probably mad because our food stamps just came in. I had money that just came in, so I understand I was probably angry, but not angry enough to try to kill us. I would never try to kill my children. . . . I know I did not try to kill my child.

On the basis of the evidence presented, the jury found Helms guilty of criminal attempt to commit first-degree murder and first-degree endangering the welfare of a minor. Helms timely appealed.

## III. *Helms's Arguments*

On appeal, Helms challenges the sufficiency of the evidence supporting her convictions. She first argues there was no substantial evidence that she attempted to commit first-degree murder, and she next argues there was no substantial evidence to support her conviction for first-degree endangering the welfare of a minor.

---

[2]Other than Helms's testimony, there was no evidence in the record that her car had a broken tie rod.

9

A.  Criminal Attempt to Commit First-Degree Murder

For her first argument, Helms asserts that there was insufficient evidence to support the jury's finding that she attempted to commit first-degree murder.  Helms contends that the evidence at trial showed that the wreck was an accident; thus, she had no purposeful intent to cause MV's death.  Helms states that this case was based largely on the testimony of a twelve-year-old girl who had been knocked unconscious in a car crash where there was proof that the car being driven had numerous mechanical problems.  Although Helms admits having been upset and angry about the missing wallet, she testified that she did not try to kill herself or MV over a wallet.  She points out further that Stricklin never heard her say anything about harming herself or MV during their phone conversation, and she asserts that Stricklin gave detailed testimony about the mechanical issues with the car.  Helms contends that the jury was left to speculate between the testimony of MV and Stricklin. Finally, although two police officers testified that the wreck appeared to be intentional, Helms argues that neither officer was qualified as an expert in any area.[3]

Leaving credibility determinations to the jury, as we must, we hold that there was substantial evidence to support Helms's conviction for criminal attempt to commit first-degree murder.  MV testified that Helms became irate with MV for losing her wallet and

---

[3]We note that Helms did not object to either of the officers' testimony regarding their observations and conclusions as to the cause of the wreck.  Therefore, to the extent Helms argues that their testimony was erroneously admitted, that argument is not preserved for review.  *See Gadsden v. State*, 2019 Ark. App. 153, 570 S.W.3d 527

began driving faster and faster with MV riding as a passenger in the car. According to MV, Helms told her she was going to kill her and Helms both because MV did not deserve to live, and if MV was going to die, Helms was going to die with her. After that, Helms called Stricklin and told him she was going to wreck the car with both of them in it because MV did not deserve to live, and Helms told Stricklin to tell her other two children that she loves them. MV stated that shortly after Helms had made these threatening statements, MV "felt the car jerk to the left like it had been pulled and then everything went black." From the time MV emerged from the wreckage, MV consistently maintained that Helms purposely caused the wreck. MV reported this to the first bystander who arrived at the scene, to the paramedic who treated her, and to the police officers who interviewed her. Consistent with MVs account of the wreck, Investigator Bailey and Officer Middlecoff testified that there were curved yaw marks where the car had been steered off the road, but there were no signs that Helms applied the brakes or attempted to correct the vehicle, and it appeared the car was intentionally crashed. Viewing the evidence in the light most favorable to the State, this evidence compelled a conclusion beyond speculation or conjecture that Helms purposely attempted to cause MV's death.

### B. First-Degree Endangering the Welfare of a Minor

Helms next argues that there was insufficient evidence to support her conviction of first-degree endangering the welfare of a minor because there was no proof of her purpose to create a substantial risk of death or serious physical injury to MV. Helms argues that the proof of this offense was deficient for the same reasons it was deficient on the offense of

11

attempted first-degree murder. We hold that there was substantial evidence to support this conviction for the same reasons explained above.

Finally, under this point, Helms briefly argues that her conviction and sentence for first-degree endangering the welfare of a minor was a double-jeopardy violation because she was convicted of two criminal offenses for identical conduct. While conceding that this argument was not raised below, Helms states that the imposition of an illegal sentence may be raised at any time. However, in *Montgomery v. State*, 2024 Ark. App. 302, 689 S.W.3d 463, we held that an alleged double-jeopardy violation on direct appeal is not treated as an illegal sentence; rather, a defendant is required to raise the argument to the trial court. Because Helms did not raise this double-jeopardy argument in the trial court, it is not preserved for appeal. *See id.*

IV. *Conclusion*

Having reviewed the record, we hold that there was substantial evidence to support Helms's conviction for criminal attempt to commit first-degree murder and her conviction for first-degree endangering the welfare of a minor. Accordingly, both convictions are affirmed.

Affirmed.

HARRISON and BARRETT, JJ., agree.

*Sharon Kiel*, for appellant.

*Tim Griffin*, Att'y Gen., by: A. *Evangeline Bacon*, Ass't Att'y Gen., for appellee.